**UPDATE TRAFFIC SYSTEMS, INC., Plaintiff,**

v.

**Alan GOULD, Lola Gould, Sally Adamo and Betty Hockenjos, Defendants.**

No. 92–CV–2558 (TCP).

United States District Court, E.D. New York.

July 20, 1994.

Jeffrey Mintz, New York City, for plaintiff Update Traffic Systems, Inc.

Slater, Vanderpool & Breakstone by Jay L.T. Breakstone, Garden City, NY, and Grove, Jaskiewicz &. Cobert by Ronald N. Cobert and Joseph Michael Roberts, Washington, DC, for defendants.

### MEMORANDUM AND ORDER

PLATT, Chief Judge.

Defendants move to dismiss plaintiff's Amended Complaint in its entirety under Federal Rules of Civil Procedure, Rule 12(b)(6) for failure to state a claim upon which relief can be granted and for failure to plead fraud with the particularity required by the Federal Rules of Civil Procedure, Rule 9(b). For the reasons stated herein, defendants' motion is denied.

## BACKGROUND

The facts as alleged in plaintiff's Amended Complaint indicate that plaintiff, a New Jersey corporation with lawful authority through the Interstate Commerce Commission (hereinafter the "ICC") to provide transportation brokerage services, arranged for the transportation of goods through interstate commerce, making it a "transportation broker." Pursuant to customary industry practice, as a broker, plaintiff would pay the carrier fees to transport the goods in question, and the shipper would pay the broker who arranged the transportation. Compl. ¶¶ 1, 16–18.

In or about 1986, plaintiff entered in a business relationship with Ship–Rite Transporters, Inc., whose sole shareholder was defendant Alan Gould. Plaintiff believed that Ship–Rite had lawful "freight forwarder" authority from the ICC, which made it like a "shipper" of goods entitled to broker with a business such as plaintiff to arrange for the transportation of the goods. Compl. ¶¶ 19–20.

For three years, until on or about May 9, 1989, plaintiff and Ship–Rite maintained a relationship wherein plaintiff brokered transportation services for Ship–Rite. On or about that date, plaintiff's President Joseph Padula was informed by defendant Sally Adamo, the traffic manager of Ship–Rite, that Ship–Rite had changed its name to Auto

Transport America, Inc. (hereinafter "ATA"). In the course of this conversation, Ms. Adamo also informed plaintiff's President that ATA had been granted a substantial contract with the United States Government to transport the goods and personalty of U.S. servicemen returning home from overseas, and that ATA would like to use plaintiff's transportation brokerage services to arrange for such. Plaintiff was informed that Relocate America (hereinafter "Relocate") would be the division of ATA that would handle this contract, and plaintiff, believing that this organization was merely a name change from Ship–Rite with whom it had been dealing for three years, agreed to act as transportation broker for ATA/Relocate. Compl. ¶ 21, 23–26.

Starting soon thereafter, plaintiff did provide these services. Yet sometime in mid-1989, plaintiff began to experience payment problems with ATA. In repeated telephone conversations from June, 1989 through October, 1990, defendants Adamo and Betty Hockenjos, Controller of Ship–Rite and ATA, continually promised that ATA would make full payments to plaintiff. Compl. ¶¶ 27–29. As alleged, on the basis of such representations, plaintiff continued to provide services to ATA/Relocate. Compl. ¶ 33.

In July, 1990, plaintiff's President Mr. Padula contacted defendant Alan Gould regarding the monies due, having been advised and believing Gould to be the President and owner of ATA. Padula was informed that Ship–Rite had lost one of its contracts with the United States and money from ATA was needed to restore Ship–Rite to that contract. Gould also requested Padula that plaintiff continue to provide services to ATA and that the account would be paid in full by October, 1990. Plaintiff acquiesced. In October, 1990, Gould promised that the account would be paid in full by March, 1991. Sometime between October, 1990 and March, 1991, ATA ceased doing business without notice to plaintiff. Compl. ¶¶ 31–36.

As it turned out, sometime in 1988, unbeknownst to plaintiff, the U.S. started to investigate Ship–Rite for overcharging. Compl. ¶ 41. In June, 1989, the U.S. Government suspended Ship–Rite from doing any further business with the U.S. (Compl. ¶ 55), and a *qui tam* action was filed against Ship–Rite and Alan Gould in August, 1990. Compl. ¶ 47, Exhibit "B." Subsequently, on September 21, 1990, Alan Gould was indicted on 33 counts of false claims. Compl. ¶ 97, Exh. "H." Thereafter, on October 5, 1990, the U.S. suspended Alan and Lola Gould and refused to do business with ATA, having discovered that Alan Gould operated the business. Compl. ¶ 98, Exh. "I." Plaintiff was never paid the $104,836.91 owed for services provided and brought an action resulting in a default judgment against ATA in the amount of $108,152.91. Compl. ¶¶ 37, 100–101.

Plaintiff's Amended Complaint alleges that the defendants perpetrated an elaborate web of six separate schemes to defraud both the United States and the plaintiff. It enumerates four claims against them relating to the schemes. The first scheme involves Ship–Rite's attempt to defraud the United States and alleges that in 1988, the U.S. entered into a contract with Ship–Rite to transport goods under a set rate, or "tender." According to plaintiff, defendants deleted a reference on the bills of lading to the tender for that particular contract and replaced it with another Ship–Rite tender, which was three times more expensive, thus resulting in a charge to the Government which was three times higher than the initial contract price. According to plaintiff, defendant Gould knew this to be illegal and could potentially prohibit him from partaking in any future contracts with the Government, so he became an informant. Upon further investigation, on August 23, 1990, a civil *qui tam* action [1] was filed against him and Ship–Rite before Judge Mishler and soon thereafter, Gould became the subject of an Indictment for fraudulent billing on September 21, 1990. Compl. ¶¶ 41–47, 97; Exh. "B."

The second scheme charged involves the formation of ATA itself. Plaintiff claims that

---

**1.** Plaintiff alleges that this *qui tam* was filed because Alan Gould proved to be a reluctant informant. Compl. ¶ 46.

Alan Gould knew that the shenanigans described in Scheme I might preclude him from future business with the Government, so he formed ATA/Relocate under fraudulent pretenses. He named his wife and co-defendant, Lola R. Gould President and sole shareholder, thus disguising his dominant and ubiquitous participation in the corporation. Compl. ¶¶ 48–54.

Thirdly, defendants schemed to defraud plaintiff by not revealing that as of June 21, 1989, Ship–Rite was suspended from business as a result of its shady business practices and suspended from all future business dealings with the United States. Compl. ¶ 55.

Fourthly, ATA fraudulently obtained contracts with the Government. It duped the United States into thinking it was a company wholly separate from Ship–Rite by filing false affidavits indicating, among other assertions, that Lola Gould was the dominant player in the company. For example, plaintiff alleges that a Guaranteed Traffic Carrier Qualification Statement (hereinafter "GTCQS"), filed to obtain qualified freight motor carrier authority, contained false statements to the extent it claimed that Lola Gould had forty-one years of experience in the transportation industry when in fact she had none, and that no other entity would assist in the fulfillment of the contract. It also failed to disclose Alan Gould's involvement in the company. Compl. ¶¶ 56–60; Exh. "C."

Conversely, this fraud was thrust upon plaintiff and others in a different light when defendants asserted that the shift to ATA was merely a name change from Ship–Rite. Plaintiff alleges that all efforts were made to insure that third parties, such as plaintiff, believed that Ship–Rite and ATA/Relocate were effectively the same company so that they would continue business dealings with them, while the same defendants took great strides to convince the Government of just the opposite: that ATA and Ship–Rite were two distinct and separate companies, so that

the Government would award contracts to ATA/Relocate. Compl. ¶¶ 62–66.

The fifth scheme alleges that in late–1989 and 1990, the defendants fraudulently continued its operation of ATA knowing that Ship–Rite was under imminent suspension and insolvency by reason of the on-going investigation and the *qui tam* action, yet used ATA as a vehicle for its fraud. Compl. ¶¶ 67–70.

The sixth and final scheme alleged by plaintiff involves ATA/Relocate's contracts with the United States. ATA did get contracts with the United States, obtained and performed through Relocate. In order to get a contract to transport goods for the United States, it is necessary for the applying entity to obtain a Standard Carrier Alpha Code (hereinafter "SCAC") which identifies a particular contract dealing. The number of SCACs a company has is relative to the types of ICC operating authorities it possesses. Relocate only had one SCAC, based on ATA's motor carrier authority, while ATA had two SCACs: one as a freight forwarder and one as a motor carrier. Plaintiff alleges that the United States and defendants entered into their contract based solely on Relocate's motor carrier authority, which the Government believed to be separate and distinct from ATA. As this contract was made with Relocate as a motor carrier, meaning it would actually transport the goods, and was not a freight forwarder, Relocate did not have the authority to broker with plaintiff or others for transportation services.[2] In effect, Relocate was hired by the Government to actually transport the goods themselves and therefore they could not broker this freight and hire someone else to transport it.[3] In fact, ATA/Relocate submitted GTCQSs to the Government stating that no other company would assist them in the transportation of the goods. Compl. ¶¶ 58, 71–81.

Within the context of this scheme, defendant committed fraud by altering the bills of lading involved, as Ship–Rite had allegedly done earlier. The tender for the contract

---

2. As stated above, *see supra* p. 276, it is a "freight forwarder" that has the authority to broker for transportation services.

3. Plaintiff asserts that the agreement between ATA/Relocate and the Government is akin to the "Basic Agreement" found in 32 C.F.R. § 619.8.

between the U.S. and Relocate was identified by the number REAA0002, yet, it appears that defendants altered the U.S. Government Bills of Lading (hereinafter "USGBL") to reflect a different tender, identified by REAA00004, which represents a higher rate. Compl. ¶ 82–86.

According to custom and law, the "delivering carrier" who presents a USGBL is entitled to full and immediate payment of all charges. Compl. ¶ 87. Under the agreement, Relocate was hired to be the delivering carrier, but in fact, Relocate turned around and hired plaintiff to find another delivering carrier. To ensure that plaintiff's hire did not receive the full payment when it presented the USGBL with the goods, defendants had to create a scheme whereby the USGBLs would not be presented by plaintiff's common carrier.[4] To effect this scheme, defendants had to create commercial bills of lading to replace the USGBLs, which on their face would tip off the common carrier or plaintiff that Relocate was intended to transport the goods under the contract. To effect the "switch," the goods would be driven to a nearby warehouse, from where the common carrier would pick them up. At this point, the USGBL would be replaced with a commercial bill of lading. Then, to secure payment, defendants would mail the USGBL to the ultimate destination. Compl. ¶¶ 87–94; see Exh. "G" for a sample commercial bill of lading.

This scheme was motivated by defendants' intention to not pay plaintiff and others who brokered the transportation services. Defendants were successful in that they got paid for services others performed. The scheme was perpetuated since defendants would only pay in part and make promises of future payments, to induce the future provision of services. Compl. ¶ 95. Thus, defendants duped the U.S. and the plaintiffs and walked away with money for work it never performed.

Plaintiff's complaint alleges four claims. The first claim alleges violations of the Racketeer Influenced and Corrupt Organizations Act, (hereinafter "RICO"), 18 U.S.C. § 1962(a), (b) & (c), based on predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. The second claim alleges a conspiracy to violate the RICO statute, 18 U.S.C. § 1962(d). Plaintiff's third and fourth claims are for fraud and the abuse of the corporate enterprise, respectively.

## DISCUSSION

Defendants move to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted and for failure to plead fraud with the required particularity.

■ When determining the validity of a motion to dismiss, the Court must assume all facts as alleged by plaintiff to be true, drawing all reasonable inferences in favor of plaintiff. *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir.1993). On this basis, since plaintiff's complaint establishes the essential basic facts to support its claims, defendants' motion to dismiss must be denied.[5]

### I. *Plaintiff's civil RICO claims*

#### A. *General Standing*

Plaintiff's first claim alleges violations of 18 U.S.C. §§ 1962(a), (b) and (c), commonly referred to as the civil RICO statute. 18 U.S.C. § 1964(c), which allows a civil litigant

---

4. Plaintiff alleges that the carrier who actually delivered the goods became the delivering carrier, legally a party to the original contract, and entitled to a pro-rata share of the lawful delivery charges, which in this case, is 75% to 90% of all proper charges incurred by the U.S. under tender REAA0002. Thus, as part of its damages, plaintiff claims it is entitled to $500,000.00. Compl. ¶¶ 104–107.

5. In support of its motion, defendants consistently challenge the factual premises of plaintiff's claims. For example, plaintiff's fraud claim relies on the assumption that Alan Gould knew that his company, Ship–Rite, was under investigation, thus providing him incentive to create ATA/Relocate to take over the Government contracts and defraud brokers such as plaintiff to assist in the fulfillment of these contracts. Defendants contend that Gould did not know of any investigation or of the *qui tam* action, thus challenging the factual basis for the scheme. Yet, in this motion to dismiss, all facts as asserted by plaintiff must be deemed to be true, and while there may be merit for this argument, what Gould knew or should have known is a factual determination to be made by a trier of fact, ie., a jury, and not by this Court in the context of a motion to dismiss.

to sue for injuries sustained as a result of criminal RICO acts, states:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

■ In order to have standing to sue pursuant to this section, "a plaintiff must show; (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990), citing *O'Malley v. O'Neill*, 887 F.2d 1557, 1561 (11th Cir.1989). The Court went on to explain that "[f]or our purposes, the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht*, at 23–24 (citations omitted). *See also, Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) ("the plaintiff only has standing if . . . he has been injured in his business or property by the conduct constituting the violation.")

■ Here, plaintiff charges that the defendants created an enterprise and perpetuated a scheme, the purpose of which was advanced by the alleged acts of mail and wire fraud. The plaintiff in this case was injured by these fraudulent acts as they induced plaintiff to be duped by defendants' scheme. The fraud here was directed at plaintiff, as well as the United States, and therefore the injury suffered by plaintiff was proximately caused thereby. Therefore, plaintiff has standing generally to bring a civil RICO action under these facts since the injury it has suffered

was proximately caused by the RICO violations.[6]

Once standing has been established, to sufficiently state a claim under this section, a complaint must allege

> (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. . . . [P]laintiff must [also] allege [ (8) ] that he was "injured in his business or property *by reason of* a violation of § 1962." (Emphasis in original.)

*Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

■ To satisfy the above, a plaintiff is required to allege a "pattern of racketeering." The Supreme Court has stated "that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original). The acts alleged need only further a singular scheme in order to establish a pattern. *See Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989); *United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

■ Two acts reflecting relatedness and continuity may be sufficient to substantiate a "pattern," and there must be continuity to the enterprise or scheme. *Indelicato*, at 1382–1384. It is not sufficient that the enterprise or scheme has a short-lived goal or

---

6. Defendants argue that because plaintiff has a judgment in its favor for the balance of the monies due it under the contract, plaintiff has no real injury and therefore, no claim. Yet defendant points to no authority indicating that receipt of a default judgment for a breach of contract claim precludes a RICO claim. In fact, this Court deems otherwise since the two are separate claims. While damages suffered as a result of the breach may indicate the value of the injury suffered as a result of the RICO violations, damages under RICO are thrice that which would be normally recoverable for a breach. In addition, a RICO violation involves different elements, making it a wholly separate claim from breach of contract.

inherently terminable nature. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 51 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Albany Insurance Co. v. Esses*, 831 F.2d 41, 44 (2d Cir.1987).

■ In the present case, plaintiff alleges that an unspecified number of mail and wire fraud violations constitute "a pattern of racketeering in furtherance of an enterprise or scheme" which was hoped to last indefinitely. Assuming the acts themselves to have been adequately pleaded, as is discussed below, the acts furthered an ongoing scheme to defraud, which included duping the United States into believing that ATA was a wholly separate company from Ship–Rite and one in which Alan Gould was not involved. Conversely, defendants duped plaintiff into believing that ATA *was* the same company as Ship–Rite and that ATA had a contract with the Government to transport as a motor carrier, thus inducing plaintiff's participation in the scheme unknowingly. As acts performed not in an "isolated or sporadic manner" but related to and in conjunction with this scheme, they satisfy the "pattern of racketeering" requirement. *In re Crazy Eddie Securities Litigation*, 714 F.Supp. 1285, 1289 (E.D.N.Y.1989).

■ When the predicate acts substantiating a RICO claim sound in fraud, they must be pled with the particularity required by Federal Rules of Civil Procedure, Rule 9(b). *Moss*, 719 F.2d at 19; *In re Crazy Eddie Securities Litigation*, 714 F.Supp. at 1292. Rule 9(b) states that while "malice, intent, knowledge, and other conditions of mind of a person may be averred generally," fraud or mistake "shall be stated with particularity." Rule 9(b). Yet the liberal pleading rules of Rule 8 must be squared with the Rule 9(b) particularity rules. *Quaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990). Therefore it is sufficient to allege the "time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Id.; cf. Beck*, 820 F.2d at 50.

In this action, plaintiff asserts in the Complaint ¶¶ 110 and 111, that defendants "repeatedly caused letters to be mailed" which included "the posting of checks to and receipt of invoices, confirmations and acknowledgment[sic] from [p]laintiff for services rendered, the transmission of USGBLs to the ultimate destination of shipped goods, the posting of tariffs, bid solicitations and correspondence with the United States of America, the transmission of improper 'replacement' commercial bills of lading from New York to New Jersey, and mailing to and from the State of New York regarding the establishment and corporate obligations of ATA." Compl. ¶ 110. One such example is the mailing of defendant's partial payments. Compl. ¶ 28. Other examples of mailings are revealed in Compl. ¶ 39, which alleges that all defendants "posted, received and knowingly caused others to post orders, bills of lading, acknowledgements, checks and similar items or received same through the United States Postal Service for the purpose of executing said scheme and artifice. The aforesaid posting and receipt of posted materials were in violation of 18 U.S.C. § 1341."

The allegations constituting the wire fraud violations state that "[f]or the purpose of executing and attempting to execute the aforesaid schemes to defraud, [d]efendants repeatedly caused to be made and made interstate telephone calls and other uses of interstate wire facilities to and from this district and elsewhere in repeated violation of 18 U.S.C. § 1341. The use of wires include, but are not limited to interstate telephone calls to plaintiff and other transportation brokers to arrange for the shipment of goods, and false promises of future payments." Compl. ¶ 111.

■ Elsewhere in the Complaint, the specifics regarding the time and place of these communications are described. One such phone call by defendant Sally Adamo to plaintiff's President Joseph Padula occurred on May 9, 1989 to inform Mr. Padula that Ship–Rite had changed its name to ATA, that ATA had just received a contract to transport the personalty of United States servicemen, and that ATA hoped that plaintiff could provide the transportation services for that contract. Compl. ¶ 23–25. Subsequently, the complaint alleges that defendant Sally Adamo "repeatedly" called plaintiff between

May 9, 1989 and September 5, 1990, to request and arrange for plaintiff's provision of transportation brokerage services on behalf of ATA. Compl. ¶ 27. Further descriptions are offered regarding telephone calls between defendants Betty Hockenjos and Sally Adamo and plaintiff, the substance of which induced plaintiff to continue to provide services for defendant, despite the fact that monies were outstanding, on promises that full payment would be forthcoming. Compl. ¶ 29. In addition, the complaint alleges a telephone conversation between Joseph Padula and defendant Alan Gould wherein Gould represented that ATA's funds were being used to help restore Ship–Rite to a government contract it had lost earlier. Gould at that time promised that plaintiff would be paid in full once this matter was resolved, by October, 1990. Compl. ¶ 32. In October, 1990, Gould made the same representation when he told Padula that the account would be satisfied in March, 1991. Compl. ¶ 35. These allegations are sufficiently specific to satisfy the particularity requirements of Rule 9(b).

Additionally, when a plaintiff alleges that mail and wire fraud constitute the predicate acts necessary for a RICO claim, each of the acts must themselves constitute a violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. To qualify, one must have proof of "(1) a scheme or artifice to defraud or obtain money by means of false pretenses, representations, or promises; (2) a use of the mails [or interstate wires] for the purpose of executing the scheme; and (3) a specific intent to defraud either by devising, participating in or abetting the scheme." *Morrow v. Black*, 742 F.Supp. 1199, 1205 (E.D.N.Y.1990), citing 18 U.S.C. § 1341. Here, the story told by plaintiff's complaint sufficiently explains how the specific mailings and telephone calls advanced and executed defendants' schemes to defraud the plaintiff so that the contracts with the United States would be maintained, and the circumstances surrounding these events create a "strong inference" of the intent to defraud, which is sufficient. *Beck*, 820 F.2d 46, 50 (2d Cir. 1987). As a result, this Court finds that this complaint sufficiently alleges the predicate acts necessary to support a RICO claim.

Defendants argue that the predicate acts alleged by plaintiff are insufficient in that they fail to show that there was a material misstatement or omission; in other words, plaintiff has failed to show that it or the U.S. Government would have acted differently had they known all of the facts regarding ATA's true ownership or lawful authority or use of motor carriers. This argument fails to address the concerns raised by the caselaw on this issue and again, inappropriately challenges the facts as alleged by plaintiff. The acts as alleged by plaintiff adequately state predicate acts of a RICO claim based on the mail and wire fraud statutes.

*B. 18 U.S.C. § 1962(a) claim*

Plaintiff's First Cause of Action alleges that defendants Alan and Lola Gould violated § 1962(a), which states in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18 U.S.C., to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce.

18 U.S.C. § 1862(a).

The Second Circuit has stated that "to state a claim for civil damages under § 1962(a), a plaintiff must allege injury from the defendants' investment of racketeering income in an enterprise." *Quaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir.1990). This requires that the injury from the § 1962(a) violation be differentiated from those injuries caused by the predicate acts themselves, "since the essence of a violation of § 1962(a) is not commission of predicate acts but investment of racketeering income." *Id.*

This investment-injury requirement is not satisfied merely because the defendant/enterprise has reinvested money from

the racketeering acts back into its own operations, thus enabling the scheme to continue. Section 1964(c) requires that the plaintiff be injured "by reason of" a violation of one of the § 1962 subsections, meaning that the violation of § 1962(a) alone is not sufficient; plaintiff must show how its business or property was injured as a result of the violation. *Id.* at 82–83; *Vista v. Columbia Pictures, Inc.,* 725 F.Supp. 1286, 1299–1300 (S.D.N.Y. 1989). Therefore plaintiff must show that it was injured by the investment itself. "[W]hen a defendant is also the RICO enterprise and a racketeering scheme is not the enterprise's sole purpose, investment of the proceeds from the pattern of racketeering for general operations is too attenuated a causal connection to satisfy Sections 1962(a) and 1964(c)." *Williamson v. Simon & Schuster,* 735 F.Supp. 565, 568 (S.D.N.Y.1990).

If the defendant/enterprise merely invested money back into itself, the injury sustained by plaintiff is essentially a result of the "mere participation in predicate acts of racketeering" which is not sufficient and was rejected expressly by the Second Circuit and various District Courts. *Quaknine,* 897 F.2d at 82; *Gelb v. American Telephone and Telegraph Co.,* 813 F.Supp. 1022, 1024 (S.D.N.Y. 1993) ("a plaintiff's injury must be the result of a defendant's investment of the proceeds of the predicate acts, rather than the predicate acts themselves."); *Giuliano v. Everything Yogurt, Inc.,* 819 F.Supp. 240, 248–249 (E.D.N.Y.1993) (plaintiffs' § 1962(a) claim is dismissed since it is predicated on injuries "sustained through defendants' racketeering activity, not through the investment of the proceeds derived from prior racketeering activity.") In fact, to hold otherwise, would effectively make a violation of § 1962(a) synonymous with a violation of § 1962(c), which prohibits participation in an enterprise. *See infra* p. 283–284.

█ In the present case, defendants of this claim, Alan and Lola Gould, are the principals of the enterprise, who, plaintiff alleges, retained monies due plaintiff under the ATA/Relocate contracts, and instead invested that money into Ship–Rite to restore it to lost Government contracts. Plaintiff's Memo. at 9–10. This allegation substantiates an injury as a result of the investment, separate from that suffered as a result of the scheme or "mere participation in the predicate acts" themselves. As a result, defendants' motion to dismiss plaintiff's § 1962(a) claim is denied.

### C. 18 U.S.C. § 1962(b) claim.

Plaintiff asserts that defendants Alan and Lola Gould violated § 1962(b) which states:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b).

█ Plaintiff's complaint adequately alleges the required nexus between the racketeering acts and maintenance or control, the crux of a § 1962(b) violation, since it charges that through a pattern of racketeering, which included transmitting false statements to the United States as well as plaintiff, defendants Alan and Lola Gould were able to maintain an interest in the Ship–Rite/ATA/Relocate enterprise. Plaintiff's complaint has also adequately stated the proximate causation between this control and its injury, since it was directly Alan Gould's purported control of this enterprise which duped plaintiff into continuing a working relationship with ATA/Relocate, causing injury. *See Vista,* 725 F.Supp. at 1300 ("plaintiff must allege that he or she was injured as a result of the acquisition of any interest in or control of the enterprise." (citations omitted)). As a result, plaintiff has stated a claim under this section and defendants motion to dismiss must be denied.

### D. 18 U.S.C. § 1962(c) claim

Plaintiff alleges that all defendants violated § 1962(c) section, which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirect-

ly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of debt.

18 U.S.C. § 1962(c).

This section merely prohibits a person from engaging in the conduct of an enterprise through a pattern of racketeering. The Second Circuit has stated that "one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise." *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).

■ In the present case, all four defendants conducted the affairs of the enterprise through one or more of the mail or wire fraud allegations that represent the predicate acts. They were able to commit these acts as the executives of the enterprise and additionally, these acts were related to the object of the enterprise. As a result, a claim under this section has been sufficiently pled against all defendants.[7]

## II. Plaintiff's Second Claim: Civil RICO Conspiracy

18 U.S.C. § 1962(d) renders liable anyone who conspires to violate any or all of § 1962(a)–(c).[8] While a claim alleged under this section need only satisfy the requirements of Rule 8 and not Rule 9(b),[9] "a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement [to commit predicate acts]." *Hecht*, at 25 (citations omitted). *See First City National Bank and Trust Co. v. FDIC*, 730 F.Supp. 501, 509 (E.D.N.Y.1990) ("To state a claim for RICO conspiracy, plaintiff must allege that each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise."); *see also United States v. Private Sanitation Industry Ass'n of Nassau/Suffolk*, 793 F.Supp. 1114, 1146 (E.D.N.Y.1992) ("an allegation that a defendant *committed* two predicate acts is not sufficient to plead RICO conspiracy: ..." (emphasis in original)).

Plaintiff's complaint has sufficiently stated such an agreement. This complaint asserts that "[d]efendants have conspired to violate 18 U.S.C. § 1962(a), (b) and/or (c) in violation of 18 U.S.C. § 1962(d)." Compl. ¶ 120. "The defendants' agreement may be inferred from circumstantial evidence of his status in the enterprise and his knowledge of the wrongdoing." *Morrow v. Black*, 742 F.Supp. 1199, 1208 (E.D.N.Y.1990), citing *United States v. Teitler*, 802 F.2d 606, 614 (2d Cir. 1986). Here, all the defendants were executives in the enterprise and plaintiff has sufficiently pled facts indicating that, as such, they were privy to the discrete and criminal purpose of the scheme, and therefore an inference has been created that an agreement existed. As a result, plaintiff has sufficiently pled that the defendants conspired to violate the RICO statute. Defendants' motion to dismiss is denied.

## III. Third Claim: Fraud

Plaintiff alleges that there was fraud in the its contractual relationship with ATA/Relocate, which resulted in defendants being indebted to plaintiff for $104.836.91, the sum due under the contract, as well as $500,-000.00, the sum due to it as the actual delivering carrier under the contracts in question. Compl. ¶ 123–128.

---

7. Defendants assert that this claim should be dismissed since there is no factual basis for the objective of the scheme. They challenge the assertion by plaintiff that Alan Gould ever was or could have been suspended from dealing with the Government, and without such a basis, the alleged scheme has no objective. As stated above, at this juncture in these proceedings, the Court is required to accept plaintiff's factual allegations as true, and whether they are supported by common sense is for a jury to decide, not this Court.

8. It reads:

> It shall be unlawful for any person to conspire to violate any one of the provisions of subsections (a), (b), or (c).
> 18 U.S.C. § 1962(d).

9. *Hecht*, 897 F.2d at 26 n. 4.

Defendants' argument to dismiss the fraud claim is that there is no factual basis for the scheme plaintiff has alleged. Firstly, defendants assert that they did not and could not have known in mid–89, as alleged by plaintiff, of any *qui tam* action which threatened the solvency of ATA and Ship–Rite, thus providing a motive for the scheme to dupe the U.S. and plaintiff, since the suit was not unsealed until August, 1990. Defendants also argue that there is no basis for plaintiff's fraud claim since plaintiff cannot point to anything more than a general "Basic Agreement" as a prototype of the contract which defendants allegedly had with the United States. Again, this is not the time to resolve factual disputes, and this Court must accept the allegations in plaintiff's complaint as true, no matter how unlikely they may be. Therefore, defendants' arguments addressed to the factual bases of plaintiff's allegations do not provide this Court with any guidance whatsoever.

■ Defendants' additional argument is that plaintiff has failed to plead this common law fraud claim with the particularity required of Rule 9(b). As stated above with regards to the mail and wire fraud allegations made in connection with the RICO claims, the common law fraud claim must be specifically pled as to the time, manner and nature of the alleged representations upon which plaintiff detrimentally relied. *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990).

■ Plaintiff has satisfied this burden. The complaint specifies that representations were made to both the United States and the plaintiff, enabling the defendants to perpetuate their alleged charade. Compl. ¶ 103(a)(iii); 103(b)(i)–(viii); 103(c)(i)–(iii). Yet plaintiff can only recover for defendants' statements to which it was privy and upon which it detrimentally relied. *Rosen v. Spanierman,* 894 F.2d 28, 33 (2d Cir.1990), quoting *Peerless Mills, Inc. v. American Telephone and Telegraph Co.,* 527 F.2d 445 (2d Cir.1975). While it is unclear as to whether plaintiff relied on any statements made to the United States, plaintiff did rely on the representations made directly to it.[10] As to these statements, plaintiff has sufficiently stated a fraud claim.

■ Defendants also argue that plaintiff may not maintain a fraud claim because this is really a contract claim, and under New York law, one may not maintain a fraud claim if it seeks damages that result from a breach of contract. *Tesoro Petroleum Corp. v. Holborn Oil Co. Ltd.,* 108 A.D.2d 607, 607, 484 N.Y.S.2d 834, 835 (1st Dept.1985). Yet plaintiff here seeks not just the damages due under the contract, but the $500,000.00 it says it has a claim to due to its standing as a delivering carrier in the contract between ATA/Relocate and the Government. These damages are different from those anticipated by a breach of contract claim, and therefore this is a sufficiently pleaded fraud claim, not precluded by the fact that a contractual dispute is involved. *See R.H. Damon & Co. v. Softkey Software Products,* 811 F.Supp. 986, 992 (S.D.N.Y.1993).

■ Additionally, one may recover for fraud in the inducement of the contract if plaintiff is able to show "(1) misrepresentation of material fact, (2) falsity of that representation, (3) scienter, (4) reliance and (5) damages." *Aries Ventures Ltd. v. Axa Finance S.A.,* 729 F.Supp. 289, 299 (S.D.N.Y. 1990) (citations omitted). Plaintiff has sufficiently alleged that there was fraud in the inception of this contract in that defendants purposefully misrepresented significant elements of the U.S. contracts to plaintiff, and plaintiff has alleged that they relied on such representations when they accepted to provide transportation services to ATA/Relocate. Therefore the fraud claim may be maintained and defendants' motion to dismiss is denied.

## IV. Fourth Claim: Abuse of the Corporate Enterprise

Plaintiff's fourth claim asserts that defendants Alan and Lola Gould have "abused the

---

10. These statements include the representations that ATA/Relocate was merely a name change from Ship–Rite, thus inducing plaintiff to provide services as though to its old business partner, (Compl. ¶ 103(c)(i)), and that defendants would soon pay plaintiff is bill full, (Compl. ¶ 103(c)(ii) & (iii)), which lulled plaintiff into continuing to provide services which unknowingly advanced defendants' scheme.

corporate enterprise ATA for their own personal use and gain," making them "personally liable for the debts and obligations of defendant ATA and jointly and severally obligated to plaintiff in the sum of approximately $500.000.00." Compl. ¶ 135–136.

While the plaintiff has provided no such explanation, it appears to this Court that plaintiff raises this "claim" to preempt any argument by the defendants that they are not liable for acts taken by the corporations. Since this is a legitimate concern, and plaintiff has adequately alleged how the defendants may have abused the corporate enterprise to effect their scheme, defendants' motion to dismiss this claim is denied.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is denied in its entirety.

SO ORDERED.