William M. BURKE, et al., Plaintiffs,

v.

William Q. DOWLING, et al., Defendants.

No. 94–CV–3412.

United States District Court, E.D. New York.

Nov. 6, 1995.

Phoebe Milligan, Brian E. Moore, John W. Mulcahy, T. Michael, Eileen L. Quinlan, Bollinger, Inc., GMA Architecture Ltd., Ove Arup & Partners, Berkeley Paget, William Bertram & Fell.

Michael A. Spero, McCarthy and Schatzman, P.A., Princeton, NJ, for Jay F. Higgins.

Richard M. Kraver, Kraver & Levy, New York City, for William Q. Dowling.

Dennis Drebsky, Rogers & Wells, New York City, for Adams H. Nickerson, Daniel P. Davison, Ashford Hotels Ltd.

C. William Phillips, Howard, Darby & Levin, New York City, for Walter J.P. Curley.

Dennis Drebsky, Rogers & Wells, New York City, Richard M. Kraver, Kraver & Levy, New York City, for Ashford Castle, Inc., Dromoland Castle, Inc., Dowmar Securities Inc.

Roger J. Hawke, Brown & Wood, New York City, Daniel Adam Osborn, Brown & Wood, New York City, for Allied Irish Banks, P.L.C.

Michael Schuster, White & Case, New York City, for Wilde Sapte.

Andrew L. Schlafly, New York City, for William M. Burke, William R. Casey, Kathleen M. Connor, Mary J. Feeley, J. Kevin Gilgan, Bernard F., Veronica D. Joyce, Thomas F., Judy K. Kane, Scott Kaufman, Edward J. Keelan, Eugene J., Patricia K. Kirkwood, Howard S. Levine, Michael J. Loftus, Daniel J., Kathleen Loughran, Peter J., William J. McSorley, Marion McWeeney, Charles E.F. Millard, Charles Milligan,

I. Background .................................................1046
   A. Ashford Castle ...........................................1046
   B. Dromoland Castle ........................................1047
   C. Nuneham Park and Dromoland Conference Centers ..........1047
   D. Distribution of AHL's Assets ............................1048
   E. The Amended Complaint ..................................1048

II. Rule 8 ....................................................1049

III. RICO Claims ..............................................1050
   A. RICO Standing .........................................1050
     1. Creditor Plaintiffs ...................................1050
     2. Investor Plaintiffs ..................................1052
   B. § 1962(c) Claims ......................................1053
     1. Operation or Management of the Enterprise ............1054
     2. Racketeering Activities ..............................1056
       a. Mail and Wire Fraud ...............................1056
         i. Existence of a Scheme to Defraud ................1056
         ii. Use of the Mails ...............................1058
         iii. Intent to Defraud .............................1058
       b. Securities Fraud ..................................1060
         i. § 10(b) Violations .............................1062
         ii. § 12(2) Violations ............................1064
       c. Bankruptcy Fraud .................................1064
     3. Pattern Requirement..................................1067
     4. Statute of Limitations ...............................1067
   C. § 1962(d) Claims ......................................1068
   D. Respondeat Superior Claim............................1069

IV.  Supplemental Claims .............................................1070
    A.  Jurisdiction.......................................................1070
    B.  Common Law Fraud Claims ........................................1071
    C.  Breach of Contract ..............................................1071

V.  Curley's Motion to Strike...........................................1072

VI.  Conclusion .........................................................1072

## OPINION AND ORDER

ROSS, District Judge:

The principal plaintiffs in this case are American investors who sought shelter from U.S. tax laws in Irish castles. These plaintiffs contend that the defendants induced them to purchase interests in a scheme to convert these castles into luxury hotels—a project designed to produce tax benefits to upper income investors. They claim that in reality, defendants were perpetrating a type of Ponzi scheme, continually starting new hotel projects in order to pay off the debts of the old. When the project was near collapse, they claim that defendants looted the assets of their enterprise, leaving their creditors— several of whom are also plaintiffs here— unable to collect on their debts.

Plaintiffs commenced this action against defendants in the Supreme Court of the State of New York, Nassau County, alleging violations of sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as charges of common law fraud, breach of fiduciary duty, and breach of contract. Defendants removed the action to this court on July 20, 1994. Subsequently, all defendants moved to dismiss the amended complaint pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, defendants' motions are granted in part and denied in part.

## I.  Background

The factual allegations made by plaintiffs are set out at length in the amended complaint. Since it is assumed that the parties are familiar with the details of these allegations, only a summary of the essential facts is provided below. Naturally, for the purposes of this motion, the court must accept the facts alleged in the amended complaint as true and draw all reasonable factual inferences in favor of the plaintiffs. *See, e.g., IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994).

## A.  Ashford Castle

Ashford Castle ("Ashford") is an eighteenth century castle located on the western coast of Ireland that was converted into a luxury resort hotel and later acquired by Allied Irish Bank ("AIB") as a result of a failed loan. In 1985, defendants Dowling, Nickerson, and Curley decided to purchase Ashford from AIB and sell interests in the castle to investors for profit. Defendants Ashford Castle, Inc. ("ACI") and Dowmar Securities, Inc. ("Dowmar"), corporations owned and directed by Dowling, Nickerson, and Curley, handled most of the financial matters regarding the Ashford syndication. AIB agreed to be the primary lender for the project.

Numerous American investors were successfully solicited via mail by letters and a private placement memorandum ("Ashford PPM"). Among these investors are plaintiffs Burke, Casey, Connor, Higgins, Joyce, Kane, Kaufman, Keelan, Kirkwood, McGouran, McSorley, Millard, and Mulcahy ("Ashford plaintiffs"). ¶ 71.

The Ashford PPM described the layout of Ashford and detailed the terms and conditions of the syndication. However, it contained some misrepresentations, which form the basis of the Ashford plaintiffs' claims. Most significantly, the Ashford plaintiffs

claim that the syndication of Ashford was consummated even though the requisite minimum subscription level stated in the Ashford PPM, was never actually reached. Instead, the offerors of Ashford used at least eight "stand-in" investors to meet the minimum subscription level.[1] These investors lent their names to be used as names of bona fide investors, and like the bona fide investors, secured loans from AIB. However, the "stand-ins" never used any of their own money. Their obligations were paid by the offerors of Ashford, using the money from the general revenue of the castle. ¶ 78. AIB accepted and processed these "stand-in" payments, and credited the accounts of the "stand-ins" on behalf of whom the checks were being written. The Ashford offerors also received unexplained payments that were taken from the proceeds of the Ashford syndication. Pl.Ex.C.

## B. Dromoland Castle

In 1987, a second fraudulent scheme similar to the Ashford scheme was perpetrated using another Irish castle called Dromoland Castle ("Dromoland"). The Dromoland plaintiffs are Connor, Feeley, Gilgan, Joyce, Kaufman, Keelan, Levine, Loftus, Loughran, McWeeney, Millard, Charles Milligan, Phoebe Milligan, Moore, and Quinlan ("Dromoland plaintiffs").

The Dromoland private placement memorandum ("Dromoland PPM") contained misrepresentations about the financing and the use of proceeds with regard to the Dromoland project. Also, the syndication of Dromoland was consummated even though the requisite minimum subscription level stated in the Dromoland PPM, was never achieved on account of a "stand-in" fraud that resembled the one at Ashford. ¶ 94. In addition to all the defendants implicated in the Ashford scheme, Dromoland Castles, Inc. ("DCI"), a corporation formerly owned and directed by Dowling, Nickerson, and Curley, is implicated in the Dromoland scheme. Again, revenue from the castles was used to pay the "stand-in" obligations at Dromoland,

and for the unexplained personal expenses of the Dromoland offerors. ¶ 102, Pl.Ex.C.

## C. Nuneham Park and Dromoland Conference Centers

Plaintiffs charge that defendants also perpetrated additional fraudulent schemes, but do not allege any injury from these schemes in this action. In 1988, Dowling, Nickerson and Curley formed Ashford Hotels, Ltd. ("AHL"). The complaint is unclear as to the precise relationship between AHL and the other corporations run by these defendants. Plaintiffs simply state that AHL was formed to "consolidate" the management contracts of ACI and DCI, as well as other projects of the defendants. ¶¶ 47, 55. Defendant Davison joined AHL as a shareholder and director some months after its formation. ¶ 111. With AIB acting again as the primary lender, AHL then attempted to syndicate an English property known as Nuneham Park. Although plaintiffs do not allege that defendants engaged in a "stand-in" fraud with respect to Nuneham Park, they do claim that funds from the Nuneham Park project were diverted for a number of improper purposes, including the payment of obligations connected with Dromoland. ¶ 123. Defendant Wilde Sapte, AIB's law firm, is implicated in these diversions. No construction was ever performed on the Nuneham Park project. Plaintiff Higgins, who was also an Ashford investor, is pursuing claims related to Nuneham Park in a separate action in New York state court, along with another Nuneham investor. ¶ 127.

After the failure of the Nuneham Park project, AIB demanded that Dowling, Curley and Nickerson make direct payments on the Ashford and Dromoland "stand-in" units. In order to make the payments, they required diversions of additional funds. ¶ 128. Dowling, Nickerson, Curley, Davison and AIB therefore agreed on a new project, involving the expansion of Dromoland Castle and the construction of a Dromoland Conference Center ("DCC"). These funds were subse-

---

**1.** The term "stand-in" was apparently employed by defendants throughout the course of their scheme. *See* Pl.Ex. G, I.

quently diverted to pay for the "stand-in" obligations at Ashford and Dromoland. Several of the Dromoland unitholders subsequently agreed to pay $2.5 million to the DCC investors in settlement of a claim which the complaint does not identify or explain. ¶ 146. The DCC investors themselves are pursuing a separate action in Ireland, and are not parties to this action. ¶ 147.

### D. Distribution of AHL's Assets

By late 1991, the "stand-in" frauds and the continued diversion of funds from one project to another had put the directors of AHL under great financial strain. By December of 1991, it was apparent to them that AHL was insolvent. ¶ 150. Defendants then took several steps to protect themselves and AIB by securing as many of AHL's assets as possible.

First, they arranged to have AHL issue them backdated demand notes, thus making it appear that their initial equity investment in AHL was merely a loan. Plaintiffs do not contend that the defendants ever actually collected on these notes, however. Rather, they intended that AHL would deny payment, thereby allowing them to write their investments off as bad debts for tax purposes. ¶¶ 155–156.

Second, AIB instituted proceedings against AHL in the English High Court for collection of a $5.4 million debt stemming from the Nuneham Park project. The AHL directors opted neither to defend this action nor to file for bankruptcy. As a result, AHL obtained a default judgment on September 18, 1992. ¶ 160.

AHL then sought to have one of its attorneys, a partner at Wilde Sapte named Mark Gill, appointed as a receiver of an "asset" of AHL. The asset in question was an indemnification agreement, executed by plaintiff Higgins and his co-plaintiff in the Nuneham Park action, Tyree. Under this agreement, Higgins and Tyree apparently agreed to indemnify AHL for certain of its liabilities, although they claim they have no such obligations. ¶ 161.

In connection with the receivership proceedings, plaintiffs claim that Gill made numerous false representations to the English court. Most significantly, he swore to an affidavit stating that AHL had no other creditors with an interest in the indemnification agreement. ¶ 162–165. In fact, AHL had numerous other creditors, several of whom have joined as plaintiffs in this action. These plaintiffs ("creditor plaintiffs") are William Bertram & Fell, Bollinger, Inc., GMA Architecture Ltd., Ove Arup & Partners, and Paget, and their claims arise from debts owed to them in connection with yet another hotel project, the Empire Hotel in Bath, England. ¶¶ 163(b), 188. The creditor plaintiffs claim that they are entitled to a share of this asset, but that AIB, AHL and Wilde Sapte obstructed their efforts to gain access to it. As a result of the defendants' efforts to strip AHL of its assets, they claim, they are now unable to collect on the debts owed to them.

### E. The Amended Complaint

The Amended Complaint alleges seven causes of actions under various theories of liability. The first three causes of action allege violations of RICO. Count One is brought by all plaintiffs against all defendants, and charges that defendants conducted an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), based on predicate acts of mail and wire fraud, securities fraud, and bankruptcy fraud. The predicate acts of securities fraud apply to the Ashford and Dromoland "stand-in" frauds, while the predicate act of bankruptcy fraud applies only to the fraudulent distribution of assets. ¶ 175.

Count Two is also brought by all plaintiffs. It alleges that Dowling, Nickerson, Curley, Davison, AIB, and Wilde Sapte conspired to violate RICO through the schemes described above, in violation of 18 U.S.C. § 1962(d). Count Three is brought by all plaintiffs against AIB. It alleges that AIB is vicariously liable under RICO for the actions of Dowling and Gill.

The fourth through seventh causes of action seek to recover on various state law grounds. In Count Four, the Ashford and Dromoland plaintiffs charge Dowling, ACI, DCI, Dowmar and AIB with common law fraud. In Count Five, they charge Nicker-

son, Curley, and AIB with aiding and abetting fraud. Count Six is apparently brought by all plaintiffs. It seeks to recover, however, against Dowling, Nickerson, Davison, AIB and Wilde Sapte for breach of a fiduciary duty to AHL's creditors. Count Seven is brought solely by the Dromoland plaintiffs against AIB and DCI for breach of contract with respect to statements made in the Dromoland PPM and certain loan agreements between the investors and AIB.

The Ashford and Dromoland plaintiffs claim that as a result of defendants' Ponzi-like scheme, the value of their interests in Ashford and Dromoland have greatly decreased. The creditor plaintiffs claim that they have been cheated out of money that they are owed and to which they should have had access. All plaintiffs seek treble damages and punitive damages against all defendants jointly and severally.

## II. Rule 8

At the outset, defendant AIB argues that the Amended Complaint should be dismissed in its entirety pursuant to Rule 8 of the Federal Rules of Civil Procedure for failure to set forth a "short and plain statement" of plaintiffs' claims. *See* Fed.R.Civ.P. 8(a). Initially, the court notes that this argument is somewhat at odds with the contentions of AIB and the other defendants that plaintiffs have failed to plead allegations of fraud with the particularity required by Fed.R.Civ.P. 9(b). AIB nonetheless describes the complaint as a "massive pleading, filled with irrelevant detail, in an effort to convince the Court that somewhere in all those pages a claim must have been stated." AIB Mem. at 14.

▮▮▮ To be sure, plaintiffs' complaint is lengthy. It contains 115 pages and 231 numbered paragraphs, and sets forth seven causes of action by thirty-three plaintiffs against ten defendants. But "long and involved complaints do not per se fail to pass the test of sufficiency under Rule 8." *Karlinsky v. New York Racing Ass'n,* 52 F.R.D. 40, 43 (S.D.N.Y.1971). In view of the complexity of the schemes alleged, and the requirement of Rule 9 that allegations of fraud

be pleaded with particularity, the Amended Complaint does not seem inordinately long.

▮▮▮ Rule 8 is designed primarily to ensure that courts and adverse parties can understand a claim and frame a response to it. The Second Circuit has observed that:

The statement should be plain because the principal function of pleadings is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. The statement should be short because "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."

*Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1281, at 365 (1969)) (other internal citations omitted). If a complaint is so "confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," a court may dismiss it. *Id.* Absent extraordinary circumstances, however, it is an abuse of discretion for a court to dismiss a complaint under Rule 8 without granting leave to amend. *Id.*

The cases cited by AIB make it clear that the complaint in this case is not the kind of departure from the "short and plain" standard that the *Salahuddin* court had in mind. In *Moscowitz v. Brown,* 850 F.Supp. 1185 (S.D.N.Y.1994), the court dismissed a plaintiff's complaint after giving him three opportunities to replead. The amended complaint contained a bewildering array of charges, ranging from religious discrimination to defamation to insider trading to prostitution. *Id.* at 1189. The plaintiff also charged that the New York City Police Department, his former employer, was "an effective subsidiary" of Goldman, Sachs & Co., a prominent New York investment banker. *Id.* Thus the court had an ample basis for its conclusion that the complaint was "a labyrinthian prolixity of unrelated and vituperative charges." *Id.* (quoting *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (per curiam), *cert. denied,* 411 U.S. 935, 93 S.Ct. 1911, 36 L.Ed.2d 396 (1973)).

Similarly, in *Lonesome v. Lebedeff,* 141 F.R.D. 397 (E.D.N.Y.1992), a pro se plaintiff brought an action alleging a conspiracy to violate his civil rights pursuant to 42 U.S.C. § 1983. In a complaint that contained 452 paragraphs in 62 pages, he made numerous "vague and incomprehensible allegations." *Id.* at 398. The court dismissed the complaint, and granted the plaintiff leave to file an amended complaint within twenty days.

Plaintiffs in this case have made allegations that are neither vague nor incomprehensible. At a minimum, they place the defendants on notice of the charges against them and allow them sufficient opportunity to prepare a response. Nor are the allegations framed in a manner that places an inordinate burden on this court or opposing counsel. Accordingly, the court finds that the complaint meets the standards of Rule 8.[2]

### III. RICO Claims

Plaintiffs' first three counts seek to recover for alleged violations of the RICO Act of 1970. The analysis begins, therefore, with the language of the statute, which provides that "[a]ny person injured in his business or property by reason of a violation of § 1962 of this chapter may sue therefor in the appropriate United States district court, and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

■ Based on this language, courts have identified three elements which plaintiffs must establish in order to have standing to sue under RICO. Plaintiffs must allege "(1) a violation of § 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House,* 897 F.2d 21, 23 (2d Cir.1990); *see also First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). Causation, for the purposes of the RICO inquiry, requires a showing of both actual or "but-for" causation and a showing of proximate causation. *Holmes v. Securities Investor Protection Corp.,* 503

U.S. 258, 266, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992). A RICO violation proximately causes a plaintiff injury when it is "a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht,* 897 F.2d at 23.

### A. RICO Standing

■ At the outset, several of the defendants contend that plaintiffs have not pleaded facts sufficient to demonstrate standing under RICO. Because plaintiffs have alleged predicate acts of fraud as the basis of their RICO complaint, they must plead injury and causation with particularity, as required by Fed.R.Civ.P. 9(b). *See First Nationwide,* 27 F.3d at 771. For the purposes of this discussion, the court will address the allegations of the creditor plaintiffs and the Ashford and Dromoland plaintiffs separately.

### 1. Creditor Plaintiffs

Defendants Dowling, Nickerson, Davison, ACI, DCI, Dowmar and AHL (the "Dowling defendants") argue that the creditor plaintiffs have not alleged an injury cognizable under RICO. Dowling Mem. at 39–40. The court agrees, although for somewhat different reasons than those cited by the defendants.

■ As the Second Circuit has repeatedly noted, a cause of action does not accrue under RICO until damages become clear and definite. *First Nationwide,* 27 F.3d at 768. For this reason, "a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated." *Id.* Based on a careful reading of the amended complaint, the court concludes that in this case, the creditor plaintiffs have not adequately alleged such frustration of their contractual rights, and that their RICO claim is not yet ripe.

In *Bankers Trust v. Rhoades,* 859 F.2d 1096 (2d Cir.1988), *cert. denied,* 490 U.S.

---

**2.** As discussed below, however, the court finds that the allegations in the complaint concerning bankruptcy fraud and the distribution of AHL's

assets are sufficiently defective to warrant striking those allegations for cause.

1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989), the defendants sought to prevent the plaintiff from collecting a debt they owed to him by deceiving a bankruptcy court and bribing state court judges in South Carolina. The plaintiff then filed a RICO action while bankruptcy proceedings were still pending. The court held that a RICO cause of action does not accrue until a plaintiff's claim becomes clear and definite. *Id.* at 1106. It therefore found that the plaintiff could not maintain a RICO action for its lost debt, because there was still a possibility that it might be recovered in the bankruptcy proceeding. Prior to that time, the plaintiff's damages were unduly speculative.

Similarly, in *Stochastic Decisions v. DiDomenico*, 995 F.2d 1158 (2d Cir.1992), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993), the plaintiff filed a RICO action against a debtor over whom it had previously obtained two judgments in state court. After the RICO action was filed, the defendant paid one judgment, and the plaintiff had made no effort to collect on the second. *Id.* at 1162. Although the court awarded the plaintiffs treble damages for its attorney fees spent attempting to collect one judgment, it declined to award damages for the amount of the debts themselves. The Second Circuit upheld this decision, reasoning that one judgment had been paid, and that plaintiffs might still recover part of the second judgment, thereby reducing the RICO claim:

> *Bankers Trust* makes it clear that … a RICO claim does not accrue until it is established that collection of the claim or judgment has been successfully frustrated. In other words, to the extent of a successful collection, the RICO claim is abated *pro tanto*, prior to any application of trebling.

*Id.* at 1166.

In this case, the creditor plaintiffs, with one exception, give no indication that they ever even demanded payment of their debts from AHL, much less sought to obtain a judgment or enforce it. The one exception is plaintiff Paget, whose claim stems from an assignment by the British corporation Beaudesert. The complaint does allege that Beaudesert, through its attorneys, wrote a letter to AHL demanding payment on a debt. ¶ 169. AHL informed Beaudesert that the debt would not be paid. *Id.* But the complaint does not allege that Beaudesert or Paget ever took any further steps to ensure the collection of the debt. Nor does it adequately allege that such efforts would necessarily be futile. Although plaintiffs repeatedly allege that AHL is "insolvent," they also contend that it has assets which continue to be distributed to certain creditors. ¶¶ 58–59.

Thus, as in *Bankers Trust* and *Stochastic Decisions*, there remains—so far as the court can tell from the pleadings—a real possibility that the creditor plaintiffs may be able to recover all or part of their losses. Yet they have not chosen to do so through the traditional legal means available to them. Rather, they seek to recover three times what they are owed by application of the federal antiracketeering statute.

To be sure, in *GICC Capital Corp. v. Technology Financing Group*, 30 F.3d 289 (2d Cir.1994), the court held that a creditor had standing under RICO to sue a debtor company that had defaulted on a promissory note as a result of the actions defendants had taken to strip the company of its assets. The plaintiff in *GICC* had alleged that the defendant had no prospect of making payment; as in this case, there was no allegation that it had filed for or been placed into bankruptcy. The court noted that the possible availability of a state court action to collect on a debt "does not preclude [the plaintiff's] standing to pursue federal claims in federal court." *Id.* at 293.

The *GICC Capital* court, however, did not address the issue of the ripeness of the plaintiff's RICO injury, as the *First Nationwide* court had done one month earlier. The only issue before the court was the issue of proximate causation. Furthermore, the court had facts from which it could infer a definite loss; the defendant had defaulted on a promissory note that specifically spelled out terms of payment and interest, and the plaintiff had demanded payment. By contrast, here the creditor plaintiffs merely allege, without any further explanation, that they have suffered "a total loss." Because AHL is continuing to distribute its assets, they do not adequately

allege that they have no prospect of payment. Following *First Nationwide,* the court concludes that they have not alleged facts suggesting that their contractual right to payment has been frustrated. Until these plaintiffs can demonstrate that the orthodox methods of recovery have failed them, and that defendants' acts of racketeering have in fact caused them a loss, they should not be entitled to treble damages under RICO. The RICO claims brought by the creditor plaintiffs are therefore dismissed without prejudice.

If the creditor plaintiffs choose to amend their complaint to show a definite injury, they must also allege that such injury was actually and proximately caused by a RICO predicate act. In this connection, the court notes that the alleged injuries to the creditor plaintiffs appear to flow primarily from the predicate act of bankruptcy fraud, which, for the reasons discussed below, plaintiffs have failed to plead with sufficient particularity. Thus, in an amended complaint, plaintiffs must either plead bankruptcy fraud with particularity or show a direct causal link between their injury and specific acts of mail or wire fraud.

## 2. Investor Plaintiffs

■■■ The Ashford and Dromoland plaintiffs allege that the securities they purchased have declined considerably in value as a result of the racketeering activities of the various defendants. They seek to recover for the value of that decline. In addition, Plaintiffs Burke and Higgins seek to recover fees paid to attorneys and accountants for investigation of defendants' activities, and plaintiff Levine seeks to recover consequential damages arising from his loss of a finder's fee. ¶¶ 182, 185. Defendants argue, however, that plaintiffs have not alleged the kind of "clear and definite" injury, *First Nationwide,* 27 F.3d at 768, necessary for them to recover under RICO. AIB Mem. at 32–33; Dowling Mem. at 40–45; Curley Mem. at 21–25.

*First Nationwide* and *Bankers Trust* make it clear that plaintiffs cannot recover damages that are merely speculative in nature. In this case, however, plaintiffs base their claims of injury on a series of estimates for which they provide no clear factual basis.

Plaintiffs calculate their damages by subtracting the estimated current value of the castle interests from the estimated value those interests would have had in the absence of defendants' fraud. The complaint asserts that the estimated current value of the Ashford Castle interests, in the absence of fraud, would be two-and-a-half times their purchase price, and the current value of the Dromoland Castle interests would be twice their purchase price. ¶¶ 181, 184. In the case of Ashford Castle, they allege that these figures are based on "(i) the dates of purchase ... (ii) the interest paid by the plaintiffs in connection with their purchases, (iii) the substantial operating profits of the castle, and (iv) the paucity of dividends, which if they had been retained rather than diverted would have increased the values of the units." ¶ 181. In the case of Dromoland Castle, the estimates are based on a similar list of factors. ¶ 184. The complaint does not explain how the plaintiffs arrived at these formulas or even attempt to explain the relationship between these factors.

Plaintiffs' estimates of the actual values are similarly deficient. For Ashford, they claim that the estimate is based on "the lack of success by several ... investors to sell their units; in fact there have been no offers for such units for over a year." ¶ 181. While plaintiffs' inability to sell their interests should not necessarily bar them from recovery, it does not provide the court with any helpful guide as to the reliability of their estimates.

■■■ Nonetheless, the court finds that plaintiffs have alleged sufficient injury to enable them to state a claim under RICO. As plaintiffs note, they need not establish that they can obtain the precise relief they seek to survive this motion, so long as they can demonstrate that they are entitled to some relief. *The Limited v. McCrory Corp.,* 683 F.Supp. 387, 393 (S.D.N.Y.1988). As previously discussed, the complaint does state with particularity the dates, check numbers, and amounts of the payments made by ACI and DCI to AIB and to various defendants on the "stand-in" obligations. Pl.Ex.C.

Plaintiffs contend that these payments were made from the general revenue of the castles—money which properly belonged to the investors. ¶¶ 178, 103. Relying on the "general rule of fraud damages ... that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud," *First Nationwide*, 27 F.3d at 768, the court concludes that the investor plaintiffs have alleged an injury to their business or property. 18 U.S.C. § 1964.

■ With the scope of the injury thus narrowed, the court must address the issue of causation. The Ashford and Dromoland plaintiffs contend that their injury was caused by predicate acts of mail and wire fraud and of securities fraud. Specifically, they contend that they were induced to purchase interests in Ashford and Dromoland Castles by fraudulent representations in the offering memoranda. The core of their allegations is that both the Ashford and Dromoland PPMs explicitly stated that closing of the sale of castle interests was contingent upon the attainment of a minimum subscription level. They contend that defendants did not reach the minimum subscription level for either offering through the use of "legitimate" investors. Instead, they solicited numerous "stand-in" investors, whose obligations were to be paid out of the operating revenue of the castles.

■ In the context of an alleged RICO predicate act of mail fraud, a showing of proximate cause requires plaintiffs to allege that they relied on the defendants' misrepresentations, and that such reliance caused them injury. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F.Supp. 576, 586–87 (S.D.N.Y.1995). The court concludes that plaintiffs have adequately alleged reliance. In this case, the facts withheld from the plaintiffs—the information that "stand-in" investors were being used to meet the minimum subscription levels—were material in the sense that a reasonable person might not have chosen to invest in the castle interests if they had been disclosed. Plaintiffs have alleged that they relied on the statements in the offering memoranda concerning the minimum subscription levels and the qualifications of investors. The court concludes that they have alleged reliance with sufficient particularity to survive a motion to dismiss. Furthermore, it is obvious that the defendants could reasonably have foreseen that their use of castle revenue to pay "stand-in" obligations would cause injury to the investors. Clearly these diversions of funds from castle revenue would ultimately reduce the returns payed to each investor. The investor plaintiffs therefore have standing to pursue RICO claims relating to the "stand-in" scheme against the defendants.

■ With respect to the distribution of AHL's assets, plaintiffs do not have standing. Unlike the creditor plaintiffs, who describe the debts AHL owes to them and the circumstances in which they arose, the investor plaintiffs do not allege any facts to support the claim that AHL owes them money. They do not, for example, ever claim that AHL assumed the debts or obligations of ACI or DCI, or that AHL ever diverted revenue from Ashford and Dromoland to pay for "stand-in" obligations. It is thus unclear how any of the transactions relating to AHL injured the investor plaintiffs. They therefore cannot maintain a RICO action with respect to these claims.

**B. § 1962(c) Claims**

■ Count One of the Amended Complaint charges all defendants with a violation of 18 U.S.C. § 1962(c), which prohibits the conduct of a business enterprise through a pattern of racketeering activity. Plaintiffs therefore must allege seven constituent elements, namely "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

In this case, plaintiffs describe the "enterprise" as an "association-in-fact" between Dowling, Nickerson, Curley, AIB and Dow-

mar Securities that began in January, 1985. Subsequently, the enterprise was joined by ACI and DCI, the corporations which managed the hotel operations at Ashford and Dromoland Castles, respectively. In 1988, after the syndication of these two castles was complete, the enterprise was joined by Davison, AHL, and Wilde Sapte. ¶ 44. Defendants do not challenge plaintiffs' allegations concerning the existence of an enterprise, or concerning its effect on interstate or foreign commerce. They do, however, challenge the sufficiency of plaintiffs' RICO allegations on a number of other grounds, which are addressed in turn below.

## 1. Operation or Management of the Enterprise

AIB and Wilde Sapte claim that they are exempt from liability under RICO because they were not closely enough involved in the enterprise to have "conducted" its affairs within the meaning of the statute. They base this argument on the Supreme Court's holding in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), which restricted RICO liability to defendants who "participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. at 1173. AIB and Wilde Sapte each contend that they did not exercise this level of control.

The defendants in *Reves* were accountants who drafted misleading financial statements and were subsequently sued for both securities fraud and RICO violations. Although a jury ultimately found that the defendants had engaged in securities fraud, the Supreme Court upheld the grant of summary judgement in favor of the accountants on the RICO claim, holding that the mere drafting of statements based on information supplied by the board did not constitute sufficient participation in the operation or management of the enterprise. Thus, even if the defendants had engaged in intentional fraud, they could not be held liable under RICO.

*Reves,* however, involved a motion for summary judgment, on which the Court had evidence before it and could reach a final determination. AIB and Wilde Sapte have raised the "operation or management" test in this case in a motion to dismiss pursuant to Rule 12(b)(6). The issue is simply whether plaintiffs can prove any set of facts in support of their claim that would entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Moreover, the court is required to accept plaintiffs' factual allegations as true, and to draw every reasonable inference in favor of the plaintiffs. *See, e.g. Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

Plaintiffs clearly do state in conclusory form that both AIB and Wilde Sapte participated in the "operation or management" of the enterprise, and "directed" and "exerted control" over various aspects of it. ¶¶ 50, 54. AIB contends, however, that "it takes more than bald conclusory allegations ... to establish RICO liability," although it offers no authority in support of this proposition. AIB Mem. at 46. Wilde Sapte makes a similar contention, Wilde Sapte Mem. at 21 n. 9, correctly noting even under Rule 12(b)(6), the court is not required to accept "conclusions of law or unwarranted deductions" as true. *First Nationwide,* 27 F.3d 763, 771 (1994). Nonetheless, plaintiffs are entitled to discovery on their claims so long as they have pleaded some minimal factual basis which would entitle them to relief.

Wilde Sapte cites a number of cases in which courts have held that attorneys did not participate in the operation or management of an enterprise merely by providing legal services to it. Like *Reves,* however, nearly all of these cases arose in a context where the court had facts before it, rather than merely allegations in a complaint. *See Nolte v. Pearson,* 994 F.2d 1311, 1314 (8th Cir. 1993) (affirming district court's grant of directed verdict); *Gilmore v. Berg,* 820 F.Supp. 179, 180 (D.N.J.1993) (granting summary judgment to defendants on RICO claim); *Biofeedtrac v. Kolinor Optical Enterprises & Consultants,* 832 F.Supp. 585, 586 (E.D.N.Y.1993) (treating motion to dismiss as motion for summary judgment).

Courts differ somewhat as to what pleading standards *Reves* imposes on a motion to dismiss. In *Friedman v. Hartmann,* Civ. No. 91–1523, 1994 WL 376058 (S.D.N.Y. July 15, 1994), the court recently declined to apply

*Reves.* It reasoned that "it will not always be reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether an attorney was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Id.* at *2.

In other cases, however, courts have dismissed RICO claims under *Reves* without giving plaintiffs an opportunity to conduct discovery. *See Morin v. Trupin,* 835 F.Supp. 126, 133–36 (S.D.N.Y.1993) (dismissing RICO claim against attorneys where complaint merely alleged that they had drafted documents and directed other defendants as to where to sign them); *Amalgamated Bank of New York v. Marsh,* 823 F.Supp. 209 (S.D.N.Y.1993) (dismissing RICO claim against restaurant where complaint merely alleged that it received checks in embezzlement scheme).

In *Mathon v. Marine Midland Bank,* 875 F.Supp. 986 (E.D.N.Y.1995), Judge Spatt of this court elected not to follow *Morin* in deciding whether plaintiffs had adequately pleaded the involvement of attorneys in a RICO enterprise. The court reasoned that:

> The above cases [*Morin, Biofeedtrac,* and *Nolte* ] lead to the conclusion that attorneys do not incur RICO liability for the traditional functions of providing legal advice and services. However, the cases do not foreclose the possibility of an attorney or law firm maintaining a[n] operational or managerial position in a RICO enterprise. Because the court must construe all allegations in favor of the plaintiff in reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court determines for the purposes of this motion that the Amended Complaint sufficiently ... pleads a "RICO enterprise."

*Id.* at 995. The court then went on to dismiss plaintiffs' RICO complaint on the ground that plaintiffs had not adequately alleged continuity.

Relying on these precedents, the court concludes that plaintiffs have alleged a sufficient factual basis to support their contention that AIB "operated or managed" the RICO enterprise. To be sure, if AIB's involvement were limited to its knowing receipt of improperly diverted funds, it would be insufficient under *Reves* to support a RICO claim. *See Marsh,* 823 F.Supp. at 220. Similarly, its assistance in preparing the PPMs would not be sufficient under *Morin.* But plaintiffs have alleged much more than that. The Amended Complaint charges that AIB helped to initiate the scheme to syndicate Ashford Castle, a property which it owned and through which it was losing considerable money. It also alleges that AIB exerted substantial control over the other defendants as a result of the debts they owed the bank. These allegations suggest that AIB exerted increasing control over the enterprise as its financial situation became more precarious. Thus, although AIB will not be liable if it merely performed routine services for the RICO enterprise, plaintiffs are entitled to discovery to determine the extent of AIB's role.

▮ Wilde Sapte's involvement in the enterprise is less clearly alleged. Wilde Sapte is not alleged to have been involved in the syndication of Ashford and Dromoland Castles. Rather, the sole charges against it stem from its involvement in the distribution of AHL's assets—a matter in which it represented AIB. Plaintiffs contend that Wilde Sapte's role went beyond the traditional functions of providing legal services in that Gill, a Wilde Sapte partner, served as a receiver of AHL's assets, and in so doing intentionally participated in a scheme to defraud. Pls.Mem. at 39 However, even intentional participation in a fraud will not subject a defendant to RICO liability if he is not involved in the operation or management of the enterprise. *See, e.g., Biofeedtrac,* 832 F.Supp. at 588–89, 592 (attorney who suborned perjury and engaged in mail and wire fraud not sufficiently involved in operation or management to sustain RICO liability). Furthermore, Gill's service as a receiver is well within the realm of traditional legal services. *See id.* at 591 (attaching no weight to fact that attorney had served as board member and corporate secretary of defendant corporation because "corporate counsel customarily fill such roles without becoming a

part of the operation or management of the enterprise").

Furthermore, unlike the *pro se* plaintiffs in *Mathon,* plaintiffs in this case are represented by skilled counsel. The court is therefore less inclined to read their complaint with the liberality that would be appropriate to a *pro se* pleading. Given the lack of any specific allegations against Wilde Sapte, the court concludes that it was not sufficiently involved in the operation or management of the enterprise to subject it to RICO liability. Count One of the complaint is therefore dismissed without prejudice as to defendant Wilde Sapte.

## 2. Racketeering Activities

Defendants have also challenged the sufficiency of plaintiffs' claims concerning their alleged "racketeering activities." "Racketeering activity" is defined by § 1961(1) of the RICO statute to include violations of the mail and wire fraud statutes, 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and "any offense involving fraud connected with a case under Title 11 [or] fraud in the sale of securities[.]" 18 U.S.C. § 1961(1).

Because the RICO complaint alleges fraud as its predicate acts, it is governed in part by the strict pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally." Fed.R.Civ.P. 9(b). Rule 9(b) is thus an exception to the general policy of the federal rules, which require plaintiffs only to set forth "a short and plain statement" of a claim sufficient to give the opposing party notice. Fed.R.Civ.P. 8.

To satisfy the requirements of Rule 9 with respect to their fraud allegations, plaintiffs must, at a minimum, "(1) specify the statements that [they] contend[ ] were fraudulent, (2) identify the speaker, (3) state where and the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12

F.3d 1170, 1175 (2d Cir.1993) (citing *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989)).

Although Rule 9 does relax its particularity requirement with respect to allegations of malice, intent and knowledge, plaintiffs must still allege facts that "give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1128 (2d Cir.1994). The requisite "strong inference" may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Under the "conscious behavior" approach, however, "the strength of the circumstantial allegations must be correspondingly greater." *Beck v. Manufacturers Hanover Trust,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

### a. Mail and Wire Fraud

To state a claim of mail fraud under 18 U.S.C. § 1341 or wire fraud under 18 U.S.C. § 1343, a complaint must allege "(1) a scheme or artifice to defraud or to obtain money by means of false pretenses, representations, or promises; (2) use of the mails [or wires] for the purpose of executing the scheme; and (3) a specific intent to defraud either by devising, participating in, or abetting the scheme." *Update Traffic Systems v. Gould,* 857 F.Supp. 274, 282 (E.D.N.Y.1994) (quoting *Morrow v. Black,* 742 F.Supp. 1199, 1205 (E.D.N.Y.1990)); *see also Powers v. British PLC,* 57 F.3d 176, 184 (2d Cir.1995); *In re Crazy Eddie Securities Litigation,* 812 F.Supp. 338, 347 (E.D.N.Y.1993). Each of these elements is examined below in turn.

### i. Existence of a Scheme to Defraud

The court finds that the investor plaintiffs have adequately alleged the existence of a scheme to defraud them through material misrepresentations in the Ashford and Dromoland PPMs. At its core, the complaint makes the following claims. Defendants Dowling, Nickerson and Curley, through the corporations they controlled, initially solicited investors for the Ashford Cas-

tle project through several letters mailed to investors between February and May of 1985. On or about May 1, 1985, Dowling mailed copies of the Ashford PPM to potential investors. ¶ 70. The memorandum explicitly stated that the offer would close when the Ashford Minimum Subscription Level, which it defined as aggregate sales of $5.5 million or greater, was reached. Pl.Ex.A., at 7, 65, 157.

In May and June of 1985, defendants Dowling and Curley began to solicit "stand-in" investors to help them attain the minimum subscription level. Curley solicited one such stand-in, Addison Vestal, through a letter dated June 10, 1985, which promised that defendants would return his investment by mid-September unless he indicated otherwise. ¶ 73; Pl.Ex.B. Defendants then closed the syndication despite the failure to reach the minimum syndication level with legitimate investors. ¶ 74. From November 20, 1985 to April 24, 1992, defendant ACI then used its operating funds to pay the obligations of the "stand-in" investors to defendant AIB. ¶ 78. Plaintiffs have provided a list of payments made on these obligations, including check numbers, amounts, and dates.

In 1987, the same group of defendants began a syndication of Dromoland Castle in a manner substantially identical to that of Ashford Castle. Like the Ashford PPM, the Dromoland PPM stated that the closing would not occur until a minimum subscription level had been reached. ¶ 92; Pl.Ex.B., at 70–71. The defendants reached this level by relying on "stand-in" investors, whose obligations to AIB were paid out of the operating revenue of DCI, which managed the castle, and by defendant Nickerson. ¶¶ 100–102. Plaintiffs also provide a list of payments from DCI to AIB, again including check numbers, amounts, and dates. Pl. Ex.C.

Plaintiffs have adequately alleged the existence of material misrepresentations in the Ashford and Dromoland PPMs. Both offering memoranda clearly indicate that sales equivalent to the minimum subscription level is a necessary precondition to closure. *See* Defs.Ex. 2 at 64 ("Unless the Minimum Sub-

scription Level is attained by no later than one year from the date of this Memorandum, ACI shall withdraw this offering and reject all Unit Sale Agreements without liability."); Defs.Ex. 3, at 70 ("The initial Closing of Offering shall occur on or after September 1, 1987, when the Minimum Subscription and Financing Level has been attained. . . .").

The Amended Complaint also alleges—although in somewhat less clear fashion—that the minimum subscription levels for the Ashford and Dromoland Castles were not met. The Ashford PPM defined the minimum subscription level as "[t]hat number of Castle Interests the aggregate sales proceeds from the sale of which would be equal to or greater than approximately $5.5 million." Ex.A, at 157. The Dromoland PPM defined it as "[s]ubscriptions and approval of such mortgage financing arranged by DCI as Owner desires for 45 Castle Interests." Ex.D, at 145. It then indicates that at least eight "stand-in" investors were used to meet the Ashford minimum subscription level, and another eight to meet the Dromoland minimum subscription level. ¶¶ 68(b), 94(a).

As the Dowling defendants correctly note, *see* Dowling Rep.Mem. at 8, the amended complaint does not specifically state that the $5.5 million subscription level was never met. Nonetheless, the court finds that plaintiffs have alleged facts sufficient to support their claim that neither project met its minimum subscription level. Plaintiffs note that the Ashford minimum subscription level of $5.5 million was defined as the amount of money that would be raised by the sale of 62 units at $89,000 per unit. ¶ 66(b). Given an average price of $89,000, the sale of only 51 units would result in aggregate proceeds of only $4.539 million—nearly $10 million less than the minimum subscription level. In order to reach $5.5 million through the sale of only 51 units, the average sale price would need to be nearly $108,000, a figure significantly higher than defendants' estimated average. Thus plaintiffs have alleged facts adequate to support the inference that the $5.5 million figure was not met.

With respect to Dromoland Castle, plaintiffs have alleged only that "eight of the 45 units required to be sold to attain [the mini-

mum subscription level] were taken by 'stand-in' investors[.]" ¶ 94(a). This language is somewhat unclear. Plaintiffs do not expressly state the total number of units sold. The language of this allegation, however, permits the reasonable inference that exactly 45 units were sold, including eight "stand-ins." Since neither the Dowling defendants, AIB, or Curley has argued that plaintiffs have failed to plead that the Dromoland minimum subscription level was met, the court accepts this interpretation.

Plaintiffs have thus clearly alleged that closing of the Ashford and Dromoland offerings was contingent upon the attainment of the minimum subscription level, and that the minimum level was only achieved through the use of "stand-in" investors. The success of their argument thus depends on whether, under the terms of the PPMs, the "stand-in" investors "count" toward reaching the minimum levels. Plaintiffs have adequately alleged that they do not.

The Ashford PPM expressly states that "[i]nvestors will be required to represent that they are acquiring Castle Interests for their own account, for investment and not with a view toward resale or distribution thereof." Pl.Ex.A at 1. The Dromoland PPM contains virtually identical language. Pl.Ex.D at 10. "Stand-in" investors, however, were not planning to retain their interests, but simply to hold them temporarily, as the letter from Curley to Vestal makes clear. Defendants have not identified any language in either memorandum that adequately warned plaintiffs that substitute investors would be allowed to buy castle interests, then discard them or transfer their obligations to others once the minimum subscription levels were ·met.[3]

The court expresses no view as to whether the other alleged misrepresentations in the Ashford and Dromoland PPMs adequately allege a scheme to defraud the investor plaintiffs. Plaintiffs have met their burden for the purposes of this motion by pleading with

particularity the details of the "stand-in" scheme.

### ii. Use of the Mails

▪▪▪ In this case, plaintiffs have alleged numerous uses of the mails and interstate or international wires by each of the defendants, including several letters, telephone calls, facsimile transmissions, and wired checks. In most cases they have specified the date, the sender, the recipient, and the content of the communications. To be in furtherance of a scheme, a mailing need not contain any misrepresentation, and need not be an essential part of the scheme. *See Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989) ("It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot.") (citations and internal quotation marks omitted). Similarly, a defendant need not actually use the mails or wires so long as that defendant "causes" such use. Causation, for this purpose, merely requires an allegation to support the claim that use of the mails or wires was reasonably foreseeable, or likely to follow in the ordinary course of business. *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989); *see also United States v. Altman*, 48 F.3d 96, 102–03 (2d Cir.1995).

Defendants have not challenged the sufficiency of plaintiff's allegations regarding use of the mails. Given the liberal standard of proof required by the statute, the court concludes that plaintiffs have adequately alleged use of the mails and wires in furtherance of a scheme to defraud.

### iii. Intent to Defraud

▪▪▪ To satisfy Rule 9(b), allegations of fraudulent intent must "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir.1995)

---

**3.** The Dowling defendants point to language in the Ashford PPM stating that the castle investments were "NONRESIDENTIAL BUSINESS LOANS" with a "HIGH DEGREE OF RISK" and limited "PERSONAL USE," to language stating that the lender had sole discretion over its credit criteria, and to language stating that alternative financing arrangements would be permitted. Dowl.Mem. at A–2. None of these statements in any way contradicts the language cited by plaintiffs.

(citations and internal quotation marks omitted). Plaintiffs may satisfy this burden in one of two ways. First, they may allege both motive for committing fraud and a clear opportunity for doing so. *Id.; Beck v. Manufacturers Hanover Trust,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Second, they may allege "circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.* Applying this standard, the court finds that plaintiffs have adequately alleged fraudulent intent with respect to all remaining defendants except Davison and AHL.

*Dowling, Nickerson, Curley, ACI, DCI and Dowmar*

■ With respect to defendants Dowling, Nickerson, Curley and Davison and the various corporations under their control, plaintiffs easily demonstrate the requisite "strong inference" of fraudulent intent under either the "motive and opportunity" test or the "conscious behavior" test.

First, as directors or officers of the various corporations involved in the Ashford and Dromoland Castle projects (ACI, DCI and Dowmar), these defendants stood to gain significant amounts of money from the syndication and operation of these castles. Moreover, each of these defendants were "well positioned to carry out the fraudulent transaction[s]" in that each of them possessed the "trust and authority" necessary to effectuate fraud. *Powers,* 57 F.3d at 185.

Second, plaintiffs have alleged numerous circumstances pointing to conscious behavior by each of these defendants, including several letters that evince their awareness of the "stand-in" scheme. Pl.Ex. B, E, G, H, I. They have also detailed numerous payments made by defendants ACI and DCI in connection with the "stand-in" scheme. Pl.Ex. C, F.

■ Defendant Curley does not appear to contest the allegations concerning fraudulent intent. The Dowling defendants do contest the allegation of intent, but fail to offer any coherent argument as to why plaintiffs'

allegations of intent are insufficient. They argue, for example, that "there is not a single allegation as to an oral misrepresentation to any plaintiff or a showing that any of the named defendants knowingly or intentionally participated in drafting the express or implied 'representation[s]' " in the Ashford and Dromoland PPMs. Dowling Mem. at 38. But a showing of fraudulent intent requires neither a showing of an oral misrepresentation or a link to drafting a specific written misrepresentation. All it requires is that plaintiffs allege facts supporting the contention that each defendant knowingly or intentionally took part in a scheme to defraud through either the "motive and opportunity" test or the "conscious behavior" test. The court finds plaintiffs have met this burden with respect to Dowling, Nickerson, Curley, ACI, DCI and Dowmar.

*AIB*

■ The Amended Complaint clearly alleges a motive for AIB's participation in the fraud scheme. Plaintiffs allege that AIB acquired Ashford Castle in 1980, when it restructured a mortgage agreement with the property's then-owner, Ashford Castle Limited (ACL). Because revenue from the castle was insufficient to cover ACL's obligations, in 1985 AIB agreed to sell its castle interest to individual investors through Dowling, Nickerson and Curley. ¶¶ 61–62.

By allowing the syndication to proceed despite the fact that its promoters failed to reach their advertised "minimum subscription level," AIB thus was able to replace a non-performing loan to ACL with loans to new investors, *see* ¶ 74, who presumably might not have bought shares in the castle had they known of the existence of "stand-in" investors. Because ACI paid the "stand-in" obligations to AIB, the scheme effectively allowed AIB to continue to withdraw funds from the operating revenue of the castle, despite the fact that it no longer owned the castle. ¶ 78. Although AIB never owned any interest in Dromoland Castle, the use of "stand-in" investors similarly allowed AIB effectively to withdraw funds from that project's revenue. ¶ 102.

The amended complaint also clearly alleges that AIB had the opportunity to commit fraud. As the primary lender on all of the syndication projects alleged, AIB drafted the financing sections of the offering memoranda for Ashford and Dromoland Castles, ¶¶ 66, 92, accepted payments from ACI and DCI on behalf of the "stand-in" investors, ¶¶ 78–79, 102; Pl.Ex.C, and continued to fund new projects despite knowledge of previous improprieties.

■ Like the Dowling defendants, AIB contends that plaintiff's allegations of fraudulent intent are deficient because the complaint does not clearly link AIB to any particular misrepresentation. However, the elements of mail and wire fraud do not require such a clear misrepresentation. They merely require plaintiffs to allege facts sufficient to support a "strong inference" of AIB's intentional participation in a scheme to defraud. Because they have adequately pleaded both motive and opportunity, the court finds that plaintiffs have satisfied this standard.

*Davison and AHL*

■ With respect to Davison and AHL, the complaint clearly does not allege intentional participation in the "stand-in" scheme. Indeed, neither of these defendants is alleged to have joined the enterprise until 1988, after the sale of the Ashford and Dromoland Castle interests. The relationship between AHL and the investor plaintiffs is somewhat unclear. As noted previously, the complaint does not explain the precise relationship between AHL, ACI and DCI, nor the manner in which AHL "consolidated" the management contracts for Ashford and Dromoland castles. While plaintiffs have alleged specific diversions of funds from ACI and DCI to cover the "stand-in" obligations, they have not alleged that AHL diverted any funds from Ashford or Dromoland to cover those obligations. Instead, plaintiffs appear to be contending that AHL diverted money from other projects to pay the Ashford and Dromoland "stand-in" obligations. AHL cannot

therefore be said to have intentionally participated in the "stand-in" fraud itself. Nor can Davison, whose role in the alleged enterprise was limited to his involvement in AHL.

The court expresses no view as to whether the participation of Davison and AHL in the other allegedly fraudulent schemes alleged in the complaint were sufficiently intentional to constitute predicate acts of mail or wire fraud. Davison's principal role in the alleged RICO enterprise was clearly his role directing the distribution of AHL's assets. These charges appear to relate solely to the creditor plaintiffs, not to the investor plaintiffs. Although the complaint does describe the investor plaintiffs as creditors of AHL, *see* ¶ 163(b)(vii), it does not explain how or why AHL owed money to those plaintiffs. Since the plaintiffs have not adequately alleged that they were injured by the distribution of AHL's assets, it is unnecessary to consider whether Davison and AHL engaged in wire fraud. To the extent that the complaint alleges fraud connected with the "stand-in" scheme, it does not allege a predicate act of mail or wire fraud by either Davison or AHL.

**b. Securities Fraud**

The complaint also alleges that the various defendants, with the exception of Davison, AHL and Wilde Sapte,[4] engaged in "fraud in the sale of securities" within the meaning of § 1961. These charges stem solely from the alleged misrepresentations in the Ashford and Dromoland PPMs. Specifically, plaintiffs charge that the schemes described above constituted violations of § 12(2) and § 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(2) & 77q(a), and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5.

These statutes provide, in pertinent part, as follows. Section 12(2) provides that:

Any person who … offers or sells a security … by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by

---

**4.** These defendants did not join the alleged RICO enterprise until after the sale of the Ashford and Dromoland castle interests. Plaintiffs acknowl-

edge that these defendants did not engage in any predicate acts of securities fraud. *See* Pl.Mem. at 28.

means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such securities from him. . . .

15 U.S.C. § 77l(2). Section 10(b) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of in interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe. . . .

15 U.S.C. § 78j. Rule 10b–5 then enumerates three categories of practices prohibited under § 10(b), making it unlawful:

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

17 C.F.R. 240.10b–5 (1989). Finally, § 17(a) prohibits three categories of practices in connection with the offer or sale of securities in language almost identical to Rule 10b–5.

At the outset, the court notes that the substantive elements of a § 10(b) violation and the elements of a § 17(a) violation are identical. *See, e.g., Jackson v. Oppenheim,* 411 F.Supp. 659, 665 (S.D.N.Y.1974) ("The Sections are essentially the same, except that Section 10(b) and Rule 10b–5 are broader in that they apply to the purchase as well as the sale of securities."), *aff'd in relevant part,* 533 F.2d 826 (2d Cir.1976); *see also United States v. Naftalin,* 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979) (noting overlap between provisions of 1933 Securities Act and 1934 Securities Exchange Act). Defendants do not dispute that a violation of § 10(b) may serve as a predicate act under RICO. *See, e.g., Crazy Eddie,* 812 F.Supp. at 351 (holding that "any violation of section 10(b) sufficiently willful to trigger . . . criminal penalties . . . constitutes 'fraud in the sale of securities.'") It is therefore unnecessary to consider the contention of the Dowling defendants that a violation of § 17(a) is not a predicate act under RICO.[5]

▮▮▮▮ Furthermore, the court notes that for a violation of either § 10(b) or § 12(2) to serve as a RICO predicate act, it must be "willful." *See Metromedia v. Fugazy,* 983 F.2d 350, 362 (2d Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Crazy Eddie,* 812 F.Supp. at 351. Willfulness requires "a showing (1) that the defendant[s] either (a)

---

**5.** The Dowling defendants correctly note that no private right of action exists under § 17(a). *See Finkel v. Stratton Corp.,* 962 F.2d 169, 175 (2d Cir.1992). Plaintiffs concede that no such right of action exists, but argue that nonetheless a violation of § 17(a) may serve as a predicate act under RICO. Pl.Mem. at 28 n. 9. While plaintiffs do not cite any clear authority for this proposition, it appears to have some support in the decisions of the Supreme Court and of this court.

In her concurring opinion in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 276, 112 S.Ct. 1311, 1322, 117 L.Ed.2d 532 (1992), Justice O'Connor considered the scope of the language in § 1961(1) defining "fraud in the sale

of securities" as a racketeering violation. She concluded that, in order for a violation of a securities law to constitute "fraud in the sale of securities" within the meaning of RICO, it must (1) be sufficiently willful to constitute a criminal violation, and (2) involve a sale of securities. *Id.* at 281, 112 S.Ct. at 1325 (O'Connor, J., concurring); *see also In re Crazy Eddie Securities Litigation,* 812 F.Supp. 338, 351 (E.D.N.Y.1993) (adopting reasoning of Justice O'Connor). Under this analysis, the relevant question would not be whether a private right of action exists under § 17(a), but whether plaintiffs have alleged facts demonstrating that defendants' conduct was sufficiently willful to constitute a criminal violation.

knowingly made false or materially incomplete statements or (b) made false or materially incomplete statements with respect to facts to which he had deliberately closed his eyes but which he had a duty to see, and (2) that he knew his statements significantly increased the possibility of a sale of the securities in question." *Metromedia,* 983 F.2d at 364.

Plaintiffs' allegations of securities fraud under § 10(b) and § 12(2) are addressed below in turn.

### i. § 10(b) Violations

■ To state a claim under § 10(b), plaintiffs must allege that each defendant used or employed a manipulative or deceptive device or contrivance, as defined in Rule 10b–5, in connection with the purchase or sale of securities. Although the scope of Rule 10b–5 literally applies to any scheme or device to defraud, *see Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 74 L.Ed.2d 548 (1983), courts typically require plaintiffs in a private § 10(b) action to allege a misstatement or omission of a material fact in connection with the purchase or sale of securities. *See, e.g., Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *Crazy Eddie,* 812 F.Supp. at 351–52. In addition, plaintiffs must also allege injury and reliance. *Id.* at 351. As noted above in the discussion of RICO standing, however, plaintiffs have already established these elements.

### (a) Misstatement or Omission of Material Fact

■ As discussed above, plaintiffs have adequately identified statements in the Ashford and Dromoland PPMs that were false or misleading. In support of their claim that the "stand-in" scheme constituted a § 10(b) violation, plaintiffs rely heavily on *SEC v. Commonwealth Securities,* 410 F.Supp. 1002 (S.D.N.Y.1976), *aff'd,* 574 F.2d 90 (2d Cir. 1978).[6] In that case, the defendant broker

commenced a public offering of securities, stating that the offering would fail unless 50,000 units were sold within ninety days. The offering circular was subsequently amended to indicate that that more than 50,650 units had been sold.

In fact, however, 8000 of the units had been placed in nominee accounts, under four separate names chosen by one of the defendants, the president of the brokerage company. That defendant testified that the "true purchaser" of the securities had instructed him to place the units in nominee accounts. However, the purchaser did not receive or pay for the units until after the closing of the offer, and the broker repurchased them after only a few weeks. *Id.* at 1007–09. The court found that this purchaser "was not a bona fide purchaser but a mere tool of the defendants for camouflaging the failure of the offering." *Id.* at 1009. It then went on to state that "[t]here can be no question that [this] conduct constitutes a scheme, artifice and device to defraud by means of both false representations and non-disclosure of material facts, in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act." *Id.* at 1016.

Defendants have attempted to distinguish *Commonwealth Securities* on several grounds. The common thread to all of their arguments, however, is that the "stand-in" investors were not "phony nominees" but actual investors who contributed money to the enterprise and whose obligations were legally binding. AIB Rep.Mem. at 6–12; Curley Rep.Mem. at 4–5; Dowling Rep.Mem. at 9. They note, for example, that in *Commonwealth Securities,* the nominees had paid no money and signed no agreements, whereas in this case, the "stand-in" investors made down payments and signed loan agreements. This amounted to a "real transfer[ ] of risk." Curley Rep.Mem. at 4.

---

6. Interestingly enough, plaintiffs do not cite the opening paragraph of Judge McMahon's opinion in that case, which notes that "[t]he complaint in this case rambles for some thirty-four pages and alleges violations of ten statutes and six rules of the Securities and Exchange Commission ... by fifteen defendants.... This has placed an intol-

erable burden upon the limited time and resources of a busy trial judge in this congested district."

The court is compelled to wonder what Judge McMahon would have made of the complaint in this case, which weighs in at 115 pages, not counting exhibits.

These arguments fail to address the heart of plaintiffs' allegations. Plaintiffs in this case are contending that the "legal obligations" of the "stand-in" investors were mere illusions. Although they made down payments, they did so on the representation that they would be "taken out" within a few months, that is, that their investments would be returned and their obligations assumed by others. *See* Pl.Ex. B. Thus while the "stand-ins" may have signed legally binding agreements, plaintiffs contend that they did *not* assume any real risks. Instead, their obligations were to be paid out of the general revenue of the castles—money which properly belonged to other investors. Since plaintiffs have pleaded particularized facts in support of this claim, the court is obligated to accept it as true. Defendants' arguments to the contrary would be better suited to the context of a motion for summary judgment.

■ The Dowling defendants note that the Dromoland PPM warned that DCI reserved the right to withdraw or modify the offer prior to closing. Dowling Mem. at B–1. Such boilerplate disclaimers, however, do not relieve offerors of their obligation to inform potential investors of changes in circumstances which render their previous statements false or misleading. *See, e.g., SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1095 (2d Cir.1972) ("Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors."). In *Manor Nursing Centers,* the defendants sold shares in a new corporation, stating that the offer would be withdrawn unless 450,000 shares were sold to the public. They then engaged in a number of transactions designed to inflate the number of shares sold, to make it appear that the 450,000 level had been met. The court found that these subsequent transactions made the prospectus misleading, and found that the defendants had violated both § 10(b) and § 17(a).

Like the plaintiffs in *Manor Nursing Centers* and *Commonwealth Securities,* the plaintiffs here contend that an offering of securities was not conducted according to the express terms of the offer. Consequently, the offer was materially false and misleading within the meaning of § 10(b).

### (b) AIB's Role in the Sale of Securities

■ To meet the particularity requirements of Rule 9, plaintiffs must allege the use of manipulative or deceptive devices by each defendant in connection with the purchase or sale of securities. Neither Curley or the Dowling defendants argues that plaintiffs have failed to plead their role in the issuance of the offering memoranda with sufficient particularity. AIB, however, argues persuasively that plaintiffs have not sufficiently alleged that it was involved in the preparation or dissemination of the memoranda to give rise to RICO liability for violation of § 10(b).

AIB's only alleged acts in connection with the sale of the castle interests is its role in preparing the PPMs. Plaintiffs allege that AIB "assisted the preparation of the acquisition, financing, and historical sections" of the Ashford PPM and "assisted the preparation of the acquisition and financing sections" of the Dromoland PPM. ¶¶ 66, 92. These allegations are insufficient to support plaintiffs' contention that AIB made false or misleading statements in connection with the sale of the castle interests.

■ Under Rule 9(b), plaintiffs must as a rule connect specific misrepresentations to specific defendants. However, the Second Circuit has recognized an exception to this rule in situations in which plaintiffs are relying on fraudulent statements in an offering memorandum. In such situations, plaintiffs may satisfy their burden by showing that defendants are "insiders or affiliates participating in the offer of the securities in question." *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *see also DiVittorio v. Equidyne Extractive Industries,* 822 F.2d 1242, 1247–49 (2d Cir.1987). As directors and officers of Dowmar, ACI and DCI, Dowling, Curley, and Nickerson clearly meet this test. Mere preparation of sections of an offering memoranda, however, does not make a drafter an "insider or affiliate." *See Friedman v. Arizona World Nurseries,* 730 F.Supp. 521, 531 (S.D.N.Y.1990) (accountants and attorneys who drafted portions of offering memoranda

not insiders or affiliates), *aff'd*, 927 F.2d 594 (2d Cir.1991); *Hayden v. Feldman,* 753 F.Supp. 116, 119 (S.D.N.Y.1990) (same). Without a more specific indication as to what statements in the offering memoranda AIB drafted, plaintiffs cannot allege fraud in the sale of securities under § 10(b) on AIB's part.

### (c) Willfulness

■ As to the remaining defendants, Dowling, Nickerson, Curley and the corporations under their control, plaintiffs have adequately alleged willfulness. The complaint clearly alleges that these defendants orchestrated the "stand-in" scheme in order to meet the minimum subscription level, thereby allowing the sale of castle interests to take place. Hence they knew that the statements in the offering memoranda were false or materially incomplete. Had they disclosed their failure to meet the minimum subscription level, the sale would not have gone forward. This strongly suggests that they were aware that their representations substantially increased the possibility of a sale of the securities in question.

### ii.  § 12(2) Violations

■ The elements of a § 12(2) violation overlap with the elements of a § 10(b) violation. Plaintiffs must allege that defendants offered or sold a security by means of a prospectus or communication which included an untrue statement of material fact of which plaintiffs were not aware. Because § 12(2) is "a broad anti-fraud measure," plaintiffs need not allege that they relied on such misrepresentations or omissions. *Akerman v. Oryx Communications,* 810 F.2d 336, 344 (2d Cir. 1987).

■ For the reasons stated above, plaintiffs have adequately alleged each of these elements with respect to defendants Dowling, Nickerson, Curley, ACI, DCI, and Dowmar. Again, however, they fail to state a claim against AIB, because they do not allege that AIB sold them securities.

■ Liability under § 12(2) is limited to those who actually "offer or sell" a security. *Wilson v. Saintine Exploration and Drilling*

*Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989); *see also Pinter v. Dahl,* 486 U.S. 622, 641–54, 108 S.Ct. 2063, 2075–82, 100 L.Ed.2d 658 (1988) (holding that only a statutory "seller" may be liable under § 12(1) of Securities Act). Under *Pinter* and *Wilson,* the term "seller" is not limited to the entity which actually passes title, but includes brokers and others who "solicit securities sales for financial gain." *Pinter,* 486 U.S. at 643, 648, 108 S.Ct. at 2076, 2079.

Relying on this definition, plaintiffs have clearly alleged that Dowling, Nickerson, Curley and the corporations under their control were "sellers" within the meaning of § 12(2). The complaint clearly alleges that these defendants solicited sales for financial gain, both in person and through the mails. AIB, however, was not a seller of the castle interests, within the meaning of the securities laws. Although AIB was the initial owner of Ashford Castle, it was ACI which owned and transferred the castle interests to investors. Accordingly, AIB cannot be said to have passed title to the securities. Nor can it properly be said that AIB "solicited" the sale of the castle interests, or acted as a broker or dealer. The Amended Complaint makes it clear that the scope of AIB's involvement in the solicitation effort was to provide "substantial assistance" in the drafting of the Ashford and Dromoland PPMs. This level of assistance is insufficient to make AIB a "seller" under § 12(2). Accordingly, the RICO allegations against AIB stemming from the predicate act of securities fraud under § 12(2) are dismissed.

### c.  Bankruptcy Fraud

■ Count One of plaintiff's complaint also charges all defendants with a predicate act of bankruptcy fraud. Specifically, plaintiffs allege that defendants' efforts to divert the assets of AHL constitute a violation of 18 U.S.C. § 152, which provides criminal penalties for any person who "in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his

**1065**

property or the property of such other person or corporation."

In response, defendants AIB and Wilde Sapte argue that, for an act of bankruptcy fraud to constitute a predicate act under RICO, an actual case must have been filed pursuant to Title 11. They base this argument on the language of § 1961(1), which defines "any offense involving fraud connected with a case under title 11" as a racketeering activity. *See* AIB.Mem. at 36–37, Wilde Sapte Mem. at 33–35, AIB Rep.Mem. at 16–17. Since no such case has been filed, these defendants argue that plaintiffs' allegation must fail. Defendant AIB goes so far as to suggest that plaintiffs' mere allegation of bankruptcy fraud is sanctionable conduct under Fed.R.Civ.P. 11.

AIB also argues that plaintiffs cannot even allege a violation of § 152 unless a case under Title 11 is actually pending. The cases it cites for this proposition are unpersuasive, however. In *United States v. Guiliano*, 644 F.2d 85 (2d Cir.1981), the court did hold that for the defendant to be convicted of bankruptcy fraud, the jury was required to find that the business from which he had concealed assets had been adjudicated a bankrupt. *Id.* at 87. The charge in that case, however, stemmed from different language in § 152. Section 152(1) pertains to a person who "conceals from a custodian, trustee, marshall, or other officer of the court charged with the control or custody of property, or in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor." This language, like the language of most of the other provisions of § 152, clearly requires that bankruptcy proceedings have commenced, and proceeded sufficiently far for a trustee, marshal or other court officer to have been appointed. The defendant in *Guiliano* was charged with concealing property from a bankruptcy trustee. The other cases cited by AIB, *United States v. Beery*, 678 F.2d 856 (10th Cir.1982), and *United States v. Rogers*, 722 F.2d 557 (9th Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984), involved similar violations.

Plaintiffs in this case, however, base their claim of bankruptcy fraud on § 152(7), which applies to a person who merely transfers or conceals assets "in contemplation of a case under title 11 ... or with intent to defeat the provisions of title 11." This language appears to define the requisite level of intent necessary to commit bankruptcy fraud under this particular subsection. Unlike the other provisions of § 152, it does not appear to require that a Title 11 case actually be pending. All that it requires is that the defendant transfer assets with the ultimate intent to defraud a bankruptcy court, whether or not such proceedings ever actually commence.

For example, in *United States v. Tashjian*, 660 F.2d 829 (1st Cir.1981), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646, the defendant was charged under § 152 in connection with the operation of a "bust-out" fraud scheme. The alleged scheme worked as follows: The defendant would purchase merchandise on credit through his store, never intending to pay for it. Instead, he would sell the merchandise below cost, intending ultimately to file for bankruptcy and leave "the mulcted creditors to pick over the meatless carcass of an assetless enterprise." *Id.* at 831–32 & n. 6. The court ultimately reversed the defendants' convictions in that case, because it found that the government had failed to prove that the bust-out operator "in any way intended to defeat the bankruptcy laws or was contemplating ... bankruptcy" with respect to the allegedly fraudulent transfers. *Id.* at 842. Tashjian thus clearly indicates that intent to defeat the bankruptcy laws is a requisite element of an offense under § 152(7). *United States v. Thomas*, 953 F.2d 107 (4th Cir.1991), cited by AIB in support of its claim, similarly required a showing that the defendant "was contemplating bankruptcy proceedings," rather than a showing that such proceedings had actually commenced. *Id.* at 108 n. 1.

Thus, regardless of whether § 1964 of the RICO statute requires plaintiffs to allege a case pending under Title 11, they must clearly allege that the defendants transferred or concealed the assets of AHL with the ultimate intent to defraud a U.S. bankruptcy court. Moreover, they must allege this with sufficient particularity to meet the require-

ments of Rule 9. The court finds that plaintiffs have not met this burden.

Plaintiffs appear to be contending that the defendants operated their enterprise in a manner similar to the "bust-out" enterprise in *Tashjian*, incurring obligations that they knew they could not meet, with the ultimate intent to escape their creditors through bankruptcy proceedings. Nowhere in the complaint, however, do plaintiffs allege with sufficient particularity that any defendant ever gave any thought to the prospect of filing for bankruptcy in a U.S. court. At most, the complaint supports an inference—albeit a strong one—that various defendants *should* have been considering bankruptcy.

Although the complaint repeatedly alleges that defendant AHL was "insolvent" by December, 1991, *e.g.* ¶¶ 52, 150, 163(c), 169, it makes only four specific references to "bankruptcy." In ¶ 157, plaintiffs allege that:

> On or about Aug. 4, 1992, defendant Davison directed James E. Bacon, the President of AHL, to draft and mail a memorandum to the seven directors and their tax advisors to justify [the issuance of backdated demand notes to AHL directors and Curley].... Davison also directed Bacon to state that AHL was likely to file for bankruptcy in the near future, which provided justification for AHL's subsequent denial of payment on the demand notes; in fact, defendants Dowling, Nickerson, Curley, Davison, AIB and Wilde Sapte had contemplated bankruptcy for AHL since the beginning of 1992, but had agreed to avoid such a filing for their own benefit....

In ¶ 160, plaintiffs then claim that, when AIB filed its action in the English High Court to recover from AHL on its obligations to AIB, the AHL directors had an obligation either to defend the action or "to cause AHL to file for bankruptcy protection," but that "defendants Davison, Nickerson and Curley wanted AHL to issue the backdated demand notes, which would not have been possible had it filed for bankruptcy."

Plaintiffs then allege in ¶ 165(b) that AIB had "an undisclosed agreement with defendants Dowling, Nickerson and Davison that AHL ... would not file for bankruptcy pro-

tection...." And in ¶ 175, plaintiffs state in conclusory form that "the filing of bankruptcy by AHL was being contemplated but would be postponed until after AIB and Wilde Sapte fraudulently obtained control of an asset of AHL." Plaintiffs do not allege that defendants ever commenced any such proceeding. Quite the contrary, they state that AHL's assets "continue to be distributed," despite its insolvency. ¶ 58.

Given the stringent standards of particularity imposed by Rule 9(b), these allegations are insufficient to support plaintiffs' claim that defendants undertook the transfer of AHL's assets "in contemplation of a case under title 11 ... or with intent to defeat the provisions of title 11." Paragraphs 165(b) and 175 merely state conclusory allegations, with no specific facts to suggest that any defendant ever considered bankruptcy. Paragraphs 150 and 160 do suggest a motive for the defendants to delay filing for bankruptcy, but fail to explain how this is related to the alleged transfer of AHL's assets. Plaintiffs do not contend that defendants intended to loot AHL's assets by issuing the backdated demand notes. Rather, their goal was to reap tax benefits when AHL declined to pay the fraudulent debt. ¶ 156. This may be suggestive of a motive for tax fraud, but it does not adequately support plaintiffs' allegation of bankruptcy fraud.

The only specific fact plaintiffs plead that suggests any "strong circumstantial evidence of conscious misbehavior or recklessness," *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir.1994), that any defendant ever gave any consideration to a filing of bankruptcy is the allegation in ¶ 157 that Davison instructed Bacon to tell the other directors of AHL that the company was likely to file soon for bankruptcy. Taken on its own, this allegation is insufficient to support plaintiffs' claim that defendants looted AHL's assets "in contemplation of a case under title 11 ... or with intent to defeat the provisions of title 11." Plaintiffs' claims with respect to the predicate act of bankruptcy fraud are therefore dismissed.

In sum, the court concludes that plaintiffs have adequately alleged two or more predi-

cate acts of mail or wire fraud by Dowling, Nickerson, Curley, ACI, DCI, Dowmar and AIB, and two predicate acts of securities fraud by all of those defendants except AIB. They fail to allege predicate acts of mail or wire fraud by Davison or AHL, securities fraud by AIB, and bankruptcy fraud by any defendant. Since neither Davison or AHL is alleged to have engaged in securities fraud, *see* Pl.Mem. at 28, Count One of the complaint is therefore dismissed without prejudice as to those defendants.

### 3. Pattern Requirement

In their reply memorandum, the Dowling defendants also allege that plaintiffs have not adequately pleaded a "pattern" of racketeering activities under RICO. Dowling Rep.Mem. at 14–15. They did not raise this argument in their opening memorandum, and plaintiffs therefore have not had an opportunity to respond to it. The court therefore need not consider the arguments raised in the reply brief at this stage.

It is worth noting, however, that the cases cited by the Dowling defendants on this point are unpersuasive. *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 660 F.Supp. 1362 (D.Conn.1987), does not discuss the pattern requirement. It does hold that mere negligent or reckless conduct will not suffice to subject a defendant to RICO liability. *Id.* at 1370–71. As previously discussed, however, plaintiffs have alleged willful conduct on the part of defendants in this case.

Defendants correctly note that *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), defines the pattern requirement under RICO. Under *H.J.,* the mere commission of two predicate acts is not enough to establish a RICO violation. Plaintiffs must show that the predicate acts are related, and that they "amount to or pose a threat of continued criminal conduct." *Id.* at 239, 109 S.Ct. at 2900. Based on the arguments before it, however, the court concludes for the purposes of this motion that plaintiffs have adequately alleged both continuity and relatedness, and that they therefore satisfy the pattern requirement.

### 4. Statute of Limitations

The Dowling defendants also suggest that plaintiffs' RICO claims are time-barred. Dowling Mem. at 53–57; Dowling Rep.Mem. at 26–27. They argue that plaintiffs received regular financial statements concerning the operations of the castles, and that they could have sought access to ACI's books, and thus had inquiry notice of the alleged fraud. As a result, they claim the applicable limitations period for their claim has expired.

Civil RICO claims are governed by a uniform four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Associates,* 483 U.S. 143, 152, 107 S.Ct. 2759, 2765, 97 L.Ed.2d 121 (1987). A cause of action accrues each time a plaintiff discovers or should have discovered an injury caused by a defendant's violation of § 1962, regardless of when the actual violation occurred. *Bankers Trust v. Rhoades,* 859 F.2d 1096, 1105 (2d Cir.1988). Plaintiffs filed the Amended Complaint on June 15, 1994. Plaintiffs and the Dowling defendants therefore agree that plaintiffs may assert claims which they did not discover and could not have discovered until after June 15, 1990. Pl.Mem. at 62; Dowl.Mem. at 53.

In support of their claim that the receipt of financial statements triggered a duty of inquiry prior to 1990, defendants cite *Henkind v. Brauser,* 1989 WL 54109 (S.D.N.Y. May 17, 1989), and *Farr v. Shearson Lehman Hutton,* 755 F.Supp. 1219 (S.D.N.Y.1991). Neither of these cases is persuasive.

In *Henkind,* the plaintiffs invested in a limited partnership that bought, sold, leased and managed automobiles. Under the terms of the partnership agreement, defendants were required to supply investors with periodic statements of their activity, and to remit net proceeds to the partnership. The defendants did not provide these statements or remit any proceeds to the partnership. The court held that the defendants' failure to send statements should have put the plaintiffs on notice of fraud. 1989 WL 54109, at *7–*8. The court did not state, as the Dowling defendants contend, that the mere opportunity to receive financial statements consti-

tutes inquiry notice. Since defendants here do not argue that plaintiffs failed to receive financial statements, *Henkind* is inapplicable.

In *Farr*, the plaintiff was the personal representative of his mother's estate. He claimed that the defendant had recommended to his mother an investment in two gas and oil limited partnerships with the knowledge that they were high-risk investments that were not suitable to her stated needs. After his mother's death, the plaintiff received an annual report which stated that these investments were risky and had produced very little return up to that date. The court held that this letter constituted actual notice of the nature of the investments and, because the plaintiff was aware of his mother's true needs, constituted inquiry notice of the alleged fraud. 755 F.Supp. at 1225–26. Again, however, the court did not state that the mere opportunity to receive financial statements constitutes inquiry notice. Rather, it premised its holding on the plaintiff's actual receipt of information that should have alerted him to the possibility of fraud.

If information in the Ashford and Dromoland reports could have alerted plaintiffs to their injuries prior to 1990, then *Farr* might apply. For the purposes of this motion, however, the court is bound by the allegations in plaintiffs' complaint. Since the complaint does not include copies of any financial statements suggesting that plaintiffs could have discovered the alleged fraud prior to June 15, 1990, the court must accept as true their claim that plaintiffs could not have discovered their injuries until plaintiff Burke began to investigate defendants' conduct in September, 1991. ¶ 180.

Furthermore, plaintiffs have alleged several payments made by ACI and DCI on the "stand-in" obligations made after June 15, 1990. Pl.Ex.C. Obviously, these injuries could not have ben discovered prior to that date. Under the rule of separate accrual propounded in *Bankers Trust*, a new cause of action accrued as of the date when plaintiffs discovered or should have discovered a new injury. Thus, for the purposes of this motion, plaintiffs' action is not time-barred.

## C. § 1962(d) Claims

Plaintiffs' RICO conspiracy claims are brought only against Dowling, Nickerson, Curley, Davison, AIB and Wilde Sapte. In order to state a claim under § 1962(d), plaintiffs must specifically allege that each of these defendants entered into an agreement to commit two predicate acts. *Hecht v. Commerce Clearing House*, 897 F.2d 21, 25 (2d Cir.1990). The fact of agreement itself, however, is insufficient to state a claim; plaintiffs must also allege that defendants "embraced the objective of the alleged conspiracy." *United States v. Viola*, 35 F.3d 37, 43 (2d Cir.1994) (quoting *United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir.1986)), *cert. denied*, —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). The defendant must be aware of the existence of a conspiracy, and understand that the RICO enterprise extends beyond his individual role. *Viola*, 35 F.3d at 44.

In addition, plaintiffs must allege an injury caused by a predicate act in furtherance of the conspiracy. *Hecht*, 897 F.2d at 25. Although Rule 9(b) does not apply to claims of conspiracy, plaintiffs must nonetheless allege "some factual basis for the finding of a conscious agreement among the defendants." *Id.* at 26 n. 4; *see also Mathon v. Marine Midland Bank*, 875 F.Supp. 986, 1001 (E.D.N.Y.1995) (dismissing RICO conspiracy claim where complaint merely contained conclusory allegation that conspiracy existed).

As discussed above, plaintiffs have adequately alleged that Dowling, Nickerson, Curley and the corporations under their control intentionally participated with AIB in a scheme to defraud investors through the commission of predicate acts of mail and wire fraud. They have also alleged injury actually and proximately caused by this fraudulent scheme. Plaintiffs therefore have also adequately alleged a RICO conspiracy with respect to these defendants.

Plaintiffs have not alleged that Wilde Sapte was sufficiently involved in the operation or management of the alleged RICO enterprise to subject it to RICO liability under § 1962(c). That does not mean,

however, that Wilde Sapte cannot be liable under § 1962(d) for conspiracy. As the Second Circuit has recently observed, "[a] defendant can be guilty of conspiring to violate a law, even if he is not among the class of persons who could commit the crime directly." *Viola*, 35 F.3d at 43. Plaintiffs have not, however, adequately alleged that Wilde Sapte understood the nature and scope of the enterprise. Wilde Sapte is not alleged to have joined the RICO enterprise until 1988, after the sale of the Ashford and Dromoland interests had already taken place. The principal allegations against Wilde Sapte stem from its role as a receiver of AHL's assets in proceedings before the English Courts. Even assuming that Wilde Sapte agreed with the defendants to commit fraud, its involvement does not clearly signify that it understood the scope of the alleged enterprise.[7] Plaintiffs do not cite any authority that suggests otherwise.

■ As to Davison, the complaint is similarly defective. Since Davison was not involved in the "stand-in" scheme, plaintiffs have not alleged that he ever agreed to commit any predicate acts which caused injury to the Ashford and Dromoland investors. Count Two of the Amended Complaint is therefore dismissed as to Wilde Sapte and Davison.

## D. Respondeat Superior Claim

Count Three of the Amended Complaint alleges that, even if AIB was not part of the RICO enterprise, it violated 1962(c) through the actions of Dowling and Gill, whom plaintiffs describe as AIB's agents. AIB argues both that Dowling was not its agent and that, as a matter of law, respondeat superior liability does not exist under RICO.

■ With respect to AIB's first argument, plaintiffs have alleged facts sufficient to support their claim that Dowling had at least apparent authority to act as agent of AIB. The complaint alleges that he represented to investors that he could obtain financing for them from AIB, approved them as borrowers, and waived the bank's application requirements. ¶ 199–200. In response, AIB argues that Dowling was actually the plaintiffs' agent with respect to these transactions. In support of this argument, they have submitted a Power of Attorney form signed by plaintiff Gilgan. Defs.Ex. 8. Clearly, the precise role that Dowling played as an intermediary involves complicated questions of fact that the court cannot address on this motion. Plaintiffs' allegations, however, are sufficient to enable their vicarious liability claim to survive this motion. The precise scope of Dowling's role might be better probed in a motion for summary judgment.

■ As to whether respondeat superior liability exists under RICO, the Second Circuit has not yet ruled definitively on this question. *See, e.g., In re Ivan F. Boesky Securities Litigation,* 36 F.3d 255, 262 (2d Cir.1994). Courts in this circuit have recognized, however, that in certain circumstances a defendant may be liable for a RICO violation committed by an agent. *See Amendolare v. Schenkers Int'l Forwarders,* 747 F.Supp. 162, 168–169 (E.D.N.Y.1990); *see also Center Cadillac v. Bank Leumi Trust Co.,* 808 F.Supp. 213, 236 (S.D.N.Y.1992) (holding that corporation may be vicariously liable where it benefitted from alleged scheme); *Gruber v. Prudential–Bache Securities,* 679 F.Supp. 165, 180 (D.Conn.1987) (holding that corporation may be liable when it is a "central figure" or "agressor" in the alleged scheme). In *Amendolare,* this court employed the "central figure" analysis used

---

7. In *Biofeedtrac v. Kolinor Enterprises,* 832 F.Supp. at 592, Judge Nickerson reached a similar conclusion regarding an attorney named as a RICO defendant. With respect to the RICO conspiracy charge against the defendant, he concluded:

> Plaintiff has neither alleged nor adduced any evidence that Kuehn agreed to do any acts other than those acts already discussed. Thus, the court cannot conclude that he conspired to

participate in the operation or management of the enterprise.

*Id.* at 592. The Second Circuit's subsequent holding in *Viola* would seem to suggest, however, that it is not necessary for a defendant to conspire to participate in the operation or management of the enterprise, so long as he understands the scope of the enterprise and agrees to commit two predicate acts in furtherance of it.

by Judge Cabranes in *Gruber*. In that case, the court concluded that:

> In order to establish corporate liability under Section 1962(c) ... it is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity.... [T]he court may then consider other factors, among them the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefitted from the racketeering activity.

679 F.Supp. at 181. The court also noted that "the fact that a corporation benefits from an illegal scheme does not in itself establish that the corporation participated as a 'central figure.'" *Id.*

Although plaintiffs have clearly alleged that AIB benefited from the alleged scheme, they do not clearly allege the kind of involvement by high-level officials at AIB necessary to invoke vicarious liability under *Amendolare* and *Gruber*. Nonetheless, the complaint permits at least a reasonable inference that such officials were, at the very least, aware of Dowling's activities. For the purposes of this motion, the court accepts this inference. AIB's motion to dismiss Count Three is therefore denied.

## IV. Supplemental Claims

### A. Jurisdiction

Counts Four through Seven of the Amended Complaint raise various state law claims against the defendants. Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over state law claims that are "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

In this case, the court has dismissed, without prejudice, the federal RICO claims by the creditor plaintiffs and against Wilde Sapte. There remains, however, a state law claim for breach of fiduciary duty against Dowling, Nickerson, Davison, AIB and Wilde Sapte.

Although this claim is brought by all plaintiffs, it appears to relate only to the creditor plaintiffs, since the investor plaintiffs have not alleged facts that suggest that AHL owed them any money. Thus Count Six properly relates only to the creditor plaintiffs, and is dismissed insofar as it purports to be brought on behalf of the Ashford and Dromoland investors. Furthermore, the claims of the creditor plaintiffs and the claims of the investor plaintiffs do not appear to spring from a "common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The investor plaintiffs claim that they were fraudulently induced to invest in Ashford and Dromoland Castles through the use of the "stand-in" scheme, and that money from the castles was subsequently diverted to pay the "stand-in" obligations. The creditor plaintiffs claim that AHL engaged their services in connection with an entirely different hotel project, and that defendants then stripped AHL of its assets and declined to pay them. None of the creditor plaintiffs was involved with the Ashford or Dromoland projects, and none of the investor plaintiffs has alleged facts supporting a claim of injury as a direct result of the diversion of AHL's assets. The link between the two claims is that they both allege wrongdoing by some of the same defendants. Thus it appears doubtful that these two claims can fairly be said to be part of the same "case or controversy." If that is so, this court has no jurisdiction over the creditor plaintiffs' breach of fiduciary duty claim.

Even if the two claims are part of the same case or controversy, the court concludes that it would be improvident to exercise jurisdiction over the creditor plaintiffs' state law claims at this time. Under § 1367, a district court may decline to exercise supplemental jurisdiction where it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. 1367(c). Given the fact that the court has dismissed the creditor plaintiffs' RICO claim, it is appropriate to decline jurisdiction over the state law claims against

them at this time. *See First City National Bank & Trust Co. v. FDIC*, 730 F.Supp. 501, 513 (E.D.N.Y.1990). Count Six of the amended complaint is therefore dismissed without prejudice.

█ Because the remaining state law counts assert state law claims by the investor plaintiffs stemming from the "stand-in" scheme, the court concludes that it has supplemental jurisdiction over these claims pursuant to § 1367(a).

## B. Common Law Fraud Claims

█ Count Four of the Amended Complaint charges Dowling, ACI, DCI, Dowmar and AIB with common law fraud in connection with the "stand-in" scheme. Count Five charges Nickerson, Curley and AIB with aiding and abetting fraud. Under New York law, a cause of action for fraud arises "when one misrepresents a material fact, knowing it is false, which another relies on to its injury." *Graubard Mollen Dannett & Horowitz v. Moscovitz*, 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995). The Dowling defendants argue variously that they made no misrepresentations, that plaintiffs could not have relied on statements in the offering memoranda because of the disclaimers therein, that the plaintiffs' injury was not proximately caused by their conduct. They argue that the cause of action for aiding and abetting should be dismissed because plaintiffs have failed to prove a primary violation. AIB argues that plaintiffs have not alleged a definite injury, that they have not alleged that they relied on misstatements, and that they have not alleged proximate causation.

All of these arguments have been addressed above. Plaintiffs have identified statements in the Ashford and Dromoland PPMs that were either false, or, in light of the omission of information concerning the stand-ins, materially misleading. They have adequately alleged reliance on the statements and injury actually and proximately caused by such reliance. Furthermore, they have alleged intent by each of the defendants named in these counts.

█ The Dowling defendants also argue that plaintiffs' fraud claim is time-barred. Under N.Y. CPLR § 203(f) and § 213(8), a cause of action for fraud must be commenced within six years of the date of the fraud or from the time when the plaintiff could have discovered the fraud with reasonable diligence. Plaintiffs contend that because of defendants' obstructions, they could not reasonably have discovered the fraud until early 1994. ¶ 180. Based on the allegations in the complaint, plaintiffs' claim is therefore not time-barred.

## C. Breach of Contract

█ Count Seven of the Amended Complaint charges DCI and AIB with breach of contract. Specifically, it claims that the loan agreements between AIB, DCI and plaintiffs Gilgan and Milligan incorporated the terms of the Dromoland PPM, which stated that plaintiffs' payments would be held in escrow until the Minimum Subscription Level was reached. In the alternative, plaintiffs argue that DCI is directly bound by the representations in the Dromoland PPM.

DCI contends that plaintiffs have failed to allege a material breach of a contract. As noted above, however, plaintiffs have alleged that the Dromoland offering was closed despite a failure to reach the minimum subscription level. Furthermore, the Dromoland PPM clearly states that:

Owner may cancel his or her purchase without liability if any condition for the Closing of Sale has not been met by DCI. DCI has the right to dispute Owner's cancellation of his or her purchase.

Upon any lawful withdrawal or rejection of his or her subscription or cancellation of his or her sale, the Owner will have the right to receive back all funds (with all interest earned thereon, if any) and agreements delivered on account of such Castle Interest purchase.

Pl.Ex. D at 71. This clearly indicates that, if defendants failed to reach the minimum subscription level, plaintiffs are entitled to their money back, in accordance with the terms of the offer.

AIB notes that its purported contractual liability arises solely from the loan agree-

ments, and contends that the loan agreements do not incorporate the terms of the Dromoland PPM. In support of this claim, AIB has submitted copies of these loan agreements, which explicitly state that the bank does not endorse or approve any statement in the offering memorandum. Defs.Ex. 6, at 13; Ex. 7, at 16. Again, however, this is a motion to dismiss, and the court must accept plaintiffs' allegations as true. AIB's arguments are better suited to the context of a motion for summary judgment. The motion to dismiss Count Seven is therefore denied.

## V. Curley's Motion to Strike

■ Finally, defendant Curley has moved to strike certain allegations in the complaint as "immaterial, impertinent and scandalous." Curley Mem. at 4. The allegations Curley refers to are paragraphs 109 to 127, which describe the Nuneham Park project, paragraphs 128 to 147, which describe the Dromoland Conference Center project, and paragraphs 148 to 151, 156, and 158, which describe the early stages of the distribution of AHL's assets, including the scheme to realize tax benefits through the issuance of fraudulent demand notes.

As noted above, plaintiffs have not alleged any injury in this action as a result of either the Nuneham Park or Dromoland Conference Center projects. Because of the similarity of these schemes to the Ashford and Dromoland schemes, however, the court concludes that these allegations are relevant to plaintiffs complaint in that they help to establish the continuity and relatedness necessary for plaintiffs to show a pattern of racketeering activity. Curley's motion to strike paragraphs 109 to 147 is therefore denied.

■ The allegations in paragraphs 148 to 173 fall into a different category, however. As discussed above, these allegations relate primarily to an alleged bankruptcy fraud, which plaintiffs have failed to plead with particularity. Furthermore, even if these allegations do state a claim for predicate acts of mail or wire fraud in connection with the distribution of AHL's assets, the complaint does not allege that any plaintiff suffered an injury cognizable under RICO as a result of such acts. Furthermore, the relevance of this scheme to the continuity and relatedness requirements of RICO is unclear.

For the foregoing reasons, paragraphs 148 to 173 of the complaint are hereby stricken. If plaintiffs choose to amend their complaint to assert claims based on the distribution of AHL's assets, they may replead these allegations, explaining with particularity how they are relevant to the RICO claim. Plaintiffs are cautioned, however, that any amended complaint they choose to file must remedy the deficiencies noted in this opinion.

## VI. Conclusion

For the foregoing reasons, Counts One, Two, and Three are hereby dismissed without prejudice with respect to the claims of the creditor plaintiffs. Count One is dismissed without prejudice as to defendants Davison, AHL, and Wilde Sapte, and dismissed without prejudice insofar as it pleads predicate acts of securities fraud by AIB or predicate acts of bankruptcy fraud. Count Two is dismissed without prejudice as to defendants Davison and Wilde Sapte, and Count Six is dismissed in its entirety without prejudice. Paragraphs 148 to 173 are hereby stricken, and plaintiffs are granted twenty days leave from the date of this opinion to file an amended complaint correcting the deficiencies noted herein.

SO ORDERED.